57 F.3d 1071
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Floyd MAYWEATHER, Carlos Montoya, Angel Miyares, Marcus
Manning, and Duncan Martin, Defendants-Appellants.
 Nos. 94-1414, 94-1530, 94-1482, 94-1705, 94-1483.
 United States Court of Appeals, Sixth Circuit.
 June 16, 1995.
 
 Before: KENNEDY and MILBURN, Circuit Judges, and WISEMAN,* District Judge.
 MILBURN, Circuit Judge.
 
 
 1
 In these consolidated appeals, defendants Floyd Mayweather (Case No. 94-1414), Carlos Montoya (Case No. 94-1982), Angel Miyares (Case No. 94-1983), Marcus Manning (Case No. 94-1530), and Duncan Martin (Case No. 94-1705), appeal their convictions of one count of conspiracy to possess cocaine with intent to distribute cocaine and distribution of cocaine in violation of 21 U.S.C. Secs. 846 and 841(a)(1). In addition, defendants Miyares and Martin challenge the sentences imposed pursuant to their convictions. On appeal, the issues are (1) whether sufficient evidence was presented to support the convictions of defendants Mayweather, Manning, Martin, and Miyares; (2) whether the government proved the existence of multiple conspiracies at trial, as opposed to the single conspiracy charged in the indictment; (3) whether the district court erred in making the various evidentiary rulings challenged by the defendants; (4) whether the district court erred when it denied the pre-trial and mid-trial severance motions of defendants Martin, Mayweather, and Manning; (5) whether defendant Martin was denied the effective assistance of counsel; and (6) whether the district court erred in sentencing defendants Martin and Miyares. For the reasons that follow, we affirm.
 
 I.
 A.
 
 2
 On January 21, 1993, a federal grand jury returned an indictment charging eleven defendants with one count of conspiracy to distribute cocaine and distribution of cocaine in violation of 18 U.S.C. Secs. 846 and 841(a)(1) during a period from "about 1987, until on or about August 1, 1992." J.A. 61. On February 18, 1993, the grand jury returned a superseding indictment charging twelve[1] defendants, including the five defendants involved in these consolidated appeals, with one count of conspiracy to distribute and possess cocaine with intent to distribute in violation of 18 U.S.C. Secs. 846 and 841(a)(1) during the period from "about 1987, until on or about August 1, 1992." J.A. 68.
 
 
 3
 The defendants were tried in a lengthy joint jury trial. On December 13, 1993, the jury returned guilty verdicts against defendants Mayweather, Montoya, Miyares, Manning, and Martin.
 
 
 4
 On April 13, 1994, defendant Mayweather was sentenced to 66 months incarceration, five years of supervised release, and a $1,000 fine. On April 25, 1994, defendant Montoya was sentenced to 121 months incarceration and five years of supervised release; defendant Miyares was sentenced to 216 months incarceration and five years of supervised release; and defendant Manning was sentenced to 240 months incarceration and ten years of supervised release. Finally, on June 6, 1994, defendant Martin was sentenced to 240 months incarceration, ten years of supervised release, and a $5,000 fine. These timely appeals followed.
 
 B.
 
 5
 The trial testimony, particularly the testimony of Omar Santamaria, William Echenique, Francisco Echenique, Sheila Echenique, Maria Carmen Echenique, Mark Pekovitch, and Marcus Martin, established the existence of a conspiracy to distribute cocaine; namely, a conspiracy to transport cocaine from Chicago, Illinois, to Grand Rapids, Michigan.
 
 
 6
 The key member of the cocaine distribution conspiracy was William Echenique, who obtained multiple kilograms of cocaine from his sources in Chicago and distributed it in Grand Rapids. The primary source of Echenique's cocaine was Ovidio Montoya, the boyfriend of Echenique's sister, Maria Carmen Echenique. Another source of cocaine, who also provided numerous kilograms of cocaine for the Echenique organization from about January 1991 until about July 1991, was defendant Angel Miyares. Defendant Miyares provided multiple kilograms of cocaine to William Echenique through two unidentified couriers as well as through several identified co-conspirators, including Jody Howland, Francisco Echenique, and Mark Petkovitch.
 
 
 7
 In addition, Ovidio Montoya's nephew, defendant Carlos Montoya, lived with William Echenique in Grand Rapids for a brief period of time and supervised Echenique's distribution of drugs in order to ensure that Echenique was able to pay Ovidio Montoya for the cocaine that Montoya supplied to him. Defendant Carlos Montoya was also a courier. Along with Maria Carmen Echenique, defendant Carlos Montoya transported drugs to Grand Rapids and took money to Chicago.
 
 
 8
 Defendant Echenique's drug distribution organization in Grand Rapids involved providing drugs on a regular basis, in quantities far greater than that required for personal use, to various persons, i.e., distributors, in Grand Rapids. Echenique's cocaine distributors included, among others, defendant Floyd Mayweather, defendant Duncan Martin, Marcus Martin, defendant Marcus Manning, Leon Manning, Victor Ward, and Ben Maglichi. In addition, William Echenique testified that some of his "customers" belonged to an organization known as the "Nasty Dawgs."
 
 
 9
 The evidence showed that defendant Mayweather received large quantities of cocaine from William Echenique. On one occasion, defendant Mayweather received one-half of a kilogram of cocaine from Echenique and that, on many occasions, Mayweather received deliveries of four and one-half ounces of cocaine or nine ounces of cocaine.
 
 
 10
 Defendant Duncan Martin was involved with Echenique from 1990 onward. Defendant Martin was a member of the "Nasty Dawgs." Defendant Martin received nine ounces of cocaine from Echenique on one occasion and received four and one-half ounces of cocaine from Echenique on multiple occasions.
 
 
 11
 In addition, there was also trial testimony concerning defendant Marcus Manning which revealed that, especially on weekend evenings, a large number of individuals arrived at his house and departed a short time later, usually within a few minutes. In particular, Eric Benson, defendant Manning's neighbor described this unusual pattern of visitors. Additionally, there was testimony that defendant Manning acted in a manner consistent with drug dealers, by hiding assets he purchased, particularly automobiles, in the names of other individuals. DEA Agent David Munson testified as an expert witness, explaining to the jury that drug dealers attempt to avoid signs of affluence, as well as loss of assets under the drug forfeiture laws, by registering their assets in other persons' names. Agent Munson also described the unique patterns of traffic associated with residences from which drugs are being sold.
 
 
 12
 Further, DEA Special Agent Bruce Peters testified concerning defendant Marcus Mannings's flight when law enforcement officers attempted to execute a warrant for Manning's arrest. Finally, there was testimony about the arrest of defendant Carlos Montoya on July 14, 1992, as the result of a reverse sting set up by a cooperating witness, Omar Santamaria. In July 1991, Santamaria telephoned defendant Carlos Montoya from the Wyoming (Michigan) police department and offered to sell cocaine to him. Defendant Carlos Montoya found a purchaser, Reuben De La Fay, who was willing to trade his Corvette automobile for the cocaine which Santamaria offered to sell.
 
 II.
 A.
 
 13
 Defendants Mayweather, Miyares, Manning, and Martin argue that insufficient evidence was presented to support their convictions. Specifically, defendant Mayweather asserts that the district court improperly overruled his motion for a judgment of acquittal under Federal Rule of Criminal Procedure ("Fed.R.Crim.P.") 29 because (1) the evidence showed multiple conspiracies, not one single conspiracy as charged in the indictment; and (2) there was no evidence that he knew of or had joined the conspiracy to distribute cocaine; rather, the only evidence was that he was an ultimate purchaser of the cocaine and did not sell or deliver the cocaine that he obtained to anyone else.[2] Defendant Miyares asserts that the evidence of the government witnesses against him was not credible because (1) "[a]ll of the Government witnesses were drug dealers, addicts, or convicted felons," (2) "[a]ll of the Government witness were granted favors in return for their testimony," and (3) there was no other evidence to corroborate the testimony against him. Brief of defendant Miyares at 8-9. Defendant Manning also argues that the government established the existence of multiple conspiracies, not a single one, that there was a variance in the indictment, and that the evidence established that he was a mere purchaser of narcotics from the conspiracy to distribute cocaine and not a member of the conspiracy. Finally, defendant Martin also asserts that the evidence presented by the government established multiple conspiracies and not the single conspiracy charged in the indictment.[3]
 
 
 14
 Our scope of review in appeals challenging the sufficiency of the evidence is limited, "[w]e must view the evidence in the light 'most favorable to the government,' " United States v. Hughes, 895 F.2d 1135, 1140 (6th Cir.1990) (quoting Glasser v. United States, 315 U.S. 60, 80 (1942)), and "are bound to make all reasonable inferences and credibility choices in support of the jury's verdict," id. (citing United States v. Stull, 743 F.2d 439, 442 (6th Cir.1984), cert. denied, 470 U.S. 1062 (1985)). Furthermore, "if 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt,' the convictions must be affirmed." Id. (emphasis in original) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). This standard also applies to challenges to a district court's denial of a defendant's motion for a judgment of acquittal under Fed.R.Crim.P. 29. United States v. Peters, 15 F.3d 540, 544 (6th Cir.), cert. denied, 115 S.Ct. 219 (1994).
 
 
 15
 The essential elements of the crime of conspiracy "are: (1) that the conspiracy described in the indictment was willfully formed, and was existing at or about the time alleged; (2) that the accused willfully became a member of the conspiracy; (3) that one of the conspirators thereafter knowingly committed at least one of the overt acts charged in the indictment, at or about the time and place alleged; and (4) that such overt act was knowingly done in furtherance of some object or purpose of the conspiracy as charged." United States v. Meyers, 646 F.2d 1142, 1143 (6th Cir.1981). "Proof of a formal agreement is unnecessary, and a tacit or material understanding among the parties is sufficient to show a conspiracy." United States v. Pearce, 912 F.2d 159, 161 (6th Cir.1990), cert. denied, 498 U.S. 1093 (1991). Further, "[p]roof of the elements [of conspiracy] may be by direct or circumstantial evidence." United States v. Forrest, 17 F.3d 916, 918 (6th Cir.) (per curiam), cert. denied, 114 S.Ct. 2115 (1994).
 
 
 16
 Furthermore, "[i]n drug conspiracy cases ... the government must prove that a conspiracy existed, that the accused knew of the conspiracy, and that he knowingly and voluntarily joined it." United States v. Christian, 786 F.2d 203, 211 (6th Cir.1986). " 'Participation in the conspiracy's common purpose and plan may be inferred from the defendant's actions and reactions to the circumstances.' " Id. (quoting United States v. Garcia, 655 F.2d 59, 62 (5th Cir.1981)). " 'Every member of a conspiracy need not be an active participant in every phase of the conspiracy, so long as he is a party to the general conspiratorial agreement.' " Id. (quoting United States v. Cuni, 689 F.2d 1353, 1356 (11th Cir.1982) (per curiam). A defendant's connection to the conspiracy " 'need only be slight, [where] there is sufficient evidence to establish that connection beyond a reasonable doubt.' " Id. (quoting United States v. Batimana, 623 F.2d 1366, 1368 (9th Cir.), cert. denied, 449 U.S. 1038 (1980)). "A defendant's guilty knowledge and voluntary participation may be inferred from surrounding circumstances." Id. Moreover, we will not reverse a conspiracy conviction " 'for lack of evidence that a defendant ... knew each detail of the conspiracy.' " Id. (quoting United States v. Vergara, 687 F.2d 57, 61 (5th Cir.1982)).
 
 
 17
 Furthermore, "[w]hether a single conspiracy or multiple conspiracies have been shown is a question of fact resolved by the jury." Hughes, 895 F.2d 1140. As this court has stated:
 
 
 18
 If an indictment alleges one conspiracy, but the evidence can reasonably be construed only as supporting a finding of multiple conspiracies, the resulting variance between the indictment and the proof is reversible error if the appellant can show that he was prejudiced thereby. In determining whether the evidence showed single or multiple conspiracies, we must bear in mind that the essence of the crime of conspiracy is agreement.
 
 
 19
 ...........................................................
 
 
 20
 ...................
 
 
 21
 * * *
 
 
 22
 In one form of conspiracy, often described as a "chain" conspiracy, the agreement can be inferred from the interdependent nature of the criminal enterprise. Conspiracies to distribute narcotics, which normally involve numerous sales and resales of drugs until they reach the ultimate consumers, are often "chain" conspiracies. Because the success of participants on each level of distribution is dependent upon the existence of other levels of distribution, each member of the conspiracy must realize that he is participating in a joint enterprise, even if he does not know the identities of many of the participants. Accordingly, a single conspiracy does not become multiple conspiracies simply because each member of the conspiracy did not know every other member, or because each member did not know of or become involved in all of the activities in furtherance of the conspiracy.
 
 
 23
 United States v. Davenport, 808 F.2d 1212, 1215-1216 (6th Cir.1987) (quoting United States v. Warner, 690 F.2d 545, 548-49 (6th Cir.1982)). In distinguishing between single and multiple conspiracies, the Seventh Circuit has stated:
 
 
 24
 "While the parties to the agreement must know of each other's existence, they need not know each other's identity nor need there be direct contact. The agreement may continue for a long period of time and include the performance of many transactions. New parties may join the agreement at any time while others may terminate their relationship. The parties are not always identical, but this does not mean that there are separate conspiracies.
 
 
 25
 The distinction must be made between separate conspiracies, where certain parties are common to all and one overall continuing conspiracy with various parties joining and terminating their relationship at different times. Various people knowingly joining together in furtherance of a common design or purpose constitute a single conspiracy. While the conspiracy may have a small group of core conspirators, other parties who knowingly participate with these core conspirators and others to achieve a common goal may be members of an overall conspiracy.
 
 
 26
 In essence, the question is what is the nature of the agreement. If there is one overall agreement among the various parties to perform different functions in order to carry out the objectives of the conspiracy, the agreement among all the parties constitutes a single conspiracy.
 
 
 27
 United States v. Abraham, 541 F.2d 1234, 1238 (7th Cir.1976) (per curiam) (quoting United States v. Varelli, 407 F.2d 735, 742 (7th Cir.1969)), cert. denied, 429 U.S. 1102 (1977). See also United States v. Grassi, 616 F.2d 1295, 1303 (5th Cir.), cert. denied, 449 U.S. 956 (1980) ("Seemingly independent transactions may be revealed as parts of a single conspiracy by their place in a pattern of regularized activity involving a significant continuity of membership.").
 
 
 28
 The evidence in this case, particularly the trial testimony of William Echenique, Francisco Echenique, Sheila Echenique, Jody Howland, Mark Pekovitch, and Marcus Martin, established the existence of a single "chain" conspiracy with William Echenique at the center between the various sources of supply and numerous local cocaine distributors. The evidence showed that the sources of the cocaine included Ovidio Montoya and defendant Miyares, and that the local distributors in the Grand Rapids, Michigan area included defendants Manning, Martin, and Mayweather, and Marcus Martin among others.
 
 
 29
 The evidence is sufficient to support the jury's conviction of defendant Mayweather. The trial testimony established that during the course of the conspiracy, defendant Mayweather received deliveries of cocaine on various occasions either from William Echenique or from Francisco Echenique, who was being assisted by Mark Pekovitch. The evidence showed that on one occasion defendant Mayweather received one-half kilogram of cocaine, on another occasion Mayweather received nine ounces of cocaine, and repeatedly received deliveries of four and one-half ounces of cocaine. Furthermore, William Echenique testified that every time he received a shipment of cocaine from Chicago, he provided cocaine to defendant Mayweather. William Echenique further testified that following his release from incarceration, he received approximately one to three kilograms of cocaine from Chicago every seven to ten days.
 
 
 30
 Moreover, Francisco Echenique testified that he delivered multi-ounce quantities of cocaine to defendant Mayweather during the two to three month period of 1991 during which he was a member of the conspiracy to distribute cocaine. Viewed in the light most favorable to the government, defendant Mayweather was a member of a single conspiracy, and he was not an ultimate consumer of the cocaine, but rather was a distributor of the cocaine. Based upon the testimony, defendant Mayweather was receiving deliveries of cocaine in excess of the amount of cocaine he could personally use. Further, without customers for the many ounces of cocaine which were received by defendant Mayweather, it would have been impossible for defendant Mayweather to have paid William Echenique for the cocaine, and without the conspiratorial agreement to ship the cocaine from Chicago to William Echenique in Grand Rapids for further distribution, defendant Mayweather would not have received the quantities of cocaine which he did.
 
 
 31
 The evidence is also sufficient to support the jury's conviction of defendant Manning. The trial testimony established that William Echenique supplied numerous kilograms of cocaine to defendant Manning. Further, there was also testimony from which the jury could have inferred that drug trafficking activity occurred at defendant Manning's residence, 1852 Union, Grand Rapids, Michigan. Defendant Manning's neighbor, Eric Benson, testified that on various occasions, he saw numerous cars parked outside of Manning's residence and that the occupants of those cars would enter the house and leave a few moments later.
 
 
 32
 Further, there was evidence that defendant Manning placed the title to two automobiles, a Cadillac and a Mercedes, in other persons' names. This evidence was followed by the testimony of Special Agent David Munson who testified, based upon his 27 years of law enforcement experience, that drug dealers often hide assets in other people's names, thereby seeking to avoid detection by the authorities as well as the application of forfeiture statutes in the event that they are apprehended by the authorities. When this evidence is viewed in the light most favorable to the government, a rational juror could find that defendant Manning was a member of cocaine distribution conspiracy.
 
 
 33
 The evidence is also sufficient to support the conviction of defendant Martin. William Echenique, Sheila Echenique, and Marcus Martin, defendant Martin's nephew, identified defendant Martin as a member of the cocaine distribution conspiracy. There was testimony that on one occasion defendant Martin received nine ounces of cocaine and that on other occasions, defendant Martin received four and one-half ounces of cocaine.
 
 
 34
 There was also evidence that defendant Martin was a member of a group known as the "Nasty Dawgs." William Echenique testified concerning the role of various members of the "Nasty Dawgs," particularly defendant Martin and his friend, Ben Maglichi, in the Echenique's drug distribution network in Grand Rapids. Viewed in the light most favorable to the government, the evidence shows that defendant Martin was receiving cocaine in excess of what he would have required as a mere user. Further, the evidence shows that without the cooperation of others in the chain of distribution, particularly Ovidio Montoya and William Echenique, defendant Martin would not have received cocaine. Furthermore, if the local distributors in Grand Rapids, such as defendants Manning, Mayweather, and Martin had not been successful in selling the cocaine to ultimate purchasers, defendant Echenique would not have received the money to pay for shipments of cocaine from Chicago, and the conspiracy would have collapsed.
 
 
 35
 Finally, although defendant Miyares argues that he is challenging the sufficiency of the evidence against him, in reality he is challenging the credibility of the witnesses against him. Miyares essentially asserts that insufficient evidence exists to support his conviction because the witnesses who testified against him were individuals with little or no credibility and who had a motivation to lie. However, the issue of the "credibility of witnesses is exclusively the province of the jury." United States v. Bond, 22 F.3d 662, 667 (6th Cir.1994). Moreover, the trial testimony established that from about January 1991 until about July 1991, Miyares supplied numerous kilograms of cocaine to William Echenique. Thus, sufficient evidence supports Miyares' conviction.
 
 B.
 
 36
 Defendants argue that several of the evidentiary rulings of the district court were erroneous. Defendants Manning, Martin, and Mayweather assert that several of the court's rulings under Federal Rule of Evidence ("Fed.R.Evid.") 801(d)(2)(E) were erroneous. Defendant Montoya argues that the admission of evidence concerning acts which occurred on July 14, 1992, was erroneous. Defendant Manning asserts that the admission of evidence which he characterizes as "other acts" evidence, including evidence of flight, testimony by narcotics agents as drug experts, and co-conspirator statements, which Manning describes as "idle chatter," was erroneous.
 
 
 37
 First, defendants Mayweather and Martin argue that the district court erred in admitting co-conspirator statements against them under Fed.R.Evid. 801(d)(2)(E). In this case, the district court determined that it would conditionally admit the hearsay statements of various witnesses, particularly William Echenique, Francisco Echenique, Sheila Echenique, Maria Carmen Echenique, and Mark Pekovitch, under the co-conspirator exception to the hearsay rule, Fed.R.Evid. 801(d)(2)(E), subject to a later demonstration of their admissibility by a preponderance of the evidence. See United States v. Vinson, 606 F.2d 149, 153 (6th Cir.1979), cert. denied, 444 U.S. 1074 (1980). If hearsay statements are admitted under the 801(d)(2)(E) co-conspirator exception, "the prosecution [is] required to show by a preponderance of the evidence that a conspiracy existed, that the defendant against whom the statements are hearsay was a participant [in the conspiracy] and that the statement was made in the course and in furtherance thereof." Id. See also Bourjaily v. United States, 483 U.S. 171, 176 (1987) ("[W]hen the preliminary facts relevant to Rule 801(d)(2)(E) are disputed, the offering party must prove them by a preponderance of the evidence.")
 
 
 38
 At the conclusion of the government's case-in-chief on December 7, 1993, the district court denied the defendant's motions for acquittal under Fed.R.Crim.P. 29, and then proceeded to rule on the admissibility of the hearsay statements under Fed.R.Evid. 801(d)(2)(E).
 
 
 39
 In making its findings, the district court stated that it
 
 
 40
 ha[d] already found in connection with the defendant's motions for judgment of acquittal that a rational trier of fact could find from the evidence that a conspiracy existed beyond a reasonable doubt.
 
 
 41
 The court further finds for purposes of this ruling that the government has established by a preponderance of the evidence that the members of the conspiracy included but were not limited to Ovidio Montoya, William Echenique, Francisco Echenique, Sheila Echenique, Maria Carmen Echenique, Mark Pekovitch, Jody Howland, Marcus Martin, Carlos Montoya, Nikola Akrap, Angel Miyares, Marcus Manning, Kevin Freeman, Duncan Martin, Floyd Mayweather, and Victor Ward.
 
 
 42
 The court further finds that all of the statements of these co-conspirators offered in these proceedings were made in the course of and in furtherance of the conspiracy.
 
 
 43
 J.A. 1571-72.
 
 
 44
 In this case, for the reasons set forth in the discussion of the sufficiency of the evidence above, the district court's decision to admit the co-conspirator's testimony was not clearly erroneous. The preponderance of the evidence connected all of the defendants to the conspiracy. Furthermore, although defendants Mayweather and Martin assert that the district court erred in not making individualized determinations as to the admissibility of the co-conspirators' statements and in not addressing the issue of single versus multiple conspiracies, the district court did not err. The district court found that the hearsay statements were admissible against the defendants involved in the conspiracy, and, as was discussed above, the evidence in this case established a single "chain" conspiracy as opposed to multiple conspiracies.
 
 
 45
 Next, defendant Montoya argues that the admission of evidence relating to a reverse sting of cocaine from a cooperating co-conspirator, Jose Omar Santamaria, to Montoya on July 14, 1992, was reversible error. Specifically, defendant Montoya asserts that the evidence of his arrest during the July 14, 1992 sting was not admissible as conduct in furtherance of the conspiracy involved in this case. Rather, defendant Montoya asserts that if the evidence concerning the July 14, 1992 sting was evidence of a conspiracy, it was evidence of a conspiracy different from the conspiracy charged in this case. Furthermore, defendant Montoya asserts that the admission of this evidence was not harmless error because without this evidence, there was inadequate evidence to convict him.
 
 
 46
 However, assuming arguendo, that the evidence of the July 14, 1992 sting was not admissible as being in furtherance of the conspiracy charged in this case, the admission of the evidence was harmless error. Evidence improperly admitted is subject to the harmless error analysis of Chapman v. California, 386 U.S. 18 (1967). "Under Chapman " '[t]he question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." ' " United States v. Daniel, 932 F.2d 517, 521 (6th Cir.) (quoting Chapman, 386 U.S. at 23) (citation omitted), cert. denied, 502 U.S. 890 (1991). "The Chapman Court also suggested the criterion whether, absent the error, the jury might have found the defendant not guilty." Id.
 
 
 47
 However, the remaining evidence against Montoya, particularly the direct testimony of William Echenique, who testified that defendant Montoya lived with him for three months oversaw the cocaine distribution operation in Grand Rapids, and assured that Ovidio Montoya received payment for the cocaine, is overwhelming and sufficient to support defendant Montoya's conviction. In addition, William Echenique's testimony was corroborated by the testimony of Maria Carmen Echenique and Sheila Echenique.
 
 
 48
 Furthermore, Maria Carmen Echenique also testified that defendant Montoya travelled with her from Chicago to Grand Rapids on three occasions. On one of those occasions, Maria Carmen and defendant Montoya travelled to Grand Rapids to collect money from William Echenique, Maria Carmen's brother. After she and defendant Montoya counted the money William Echenique gave them, William Echenique was given a box of "Fab" detergent containing cocaine. Further, on another occasion, Maria Carmen and defendant Montoya travelled to Grand Rapids with cocaine concealed in a box of "Fab" detergent, which they gave to Francisco Echenique. Thus, absent the evidence of the July 14, 1992 sting, there was still overwhelming testimonial evidence supporting defendant Montoya's conviction. Accordingly, the error in the admission of the evidence of the July 14, 1992 sting, if any, was harmless error.
 
 
 49
 Third, defendant Manning argues that the district court erred when it admitted evidence which he characterizes as "other acts" evidence; namely, evidence that defendant Manning placed assets in other persons names; evidence concerning drug deals with Ismael Nunez, an unindicted coconspirator; evidence of Manning's flight from police; and the testimony of DEA Special Agent David Munson who testified as an expert in the practice of drug traffickers.
 
 
 50
 Manning first asserts that the district court erred when, over his objection, the district court admitted evidence of his placing assets in other person's names. Fed.R.Evid. 404(b) states:
 
 
 51
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
 
 
 52
 There are four requirements for the utilization of evidence of "other acts or crimes": (1) the evidence must be relevant as required by Fed.R.Evid. 402; (2) the evidence must be offered for a proper purpose under Fed.R.Evid. 404(b), namely, the evidence must be probative of an issue other than character; (3) pursuant to Fed.R.Evid. 403, the probative value of the evidence must not be substantially outweighed by its potential for unfair prejudice; and (4) upon request of the opposing party pursuant to Fed.R.Evid. 105, the district court shall instruct the jury that the "other acts" evidence is to be considered only for the proper purpose for which it was admitted. United States v. Huddleston, 485 U.S. 681, 686, 691-92 (1988).
 
 
 53
 Furthermore, "[t]he district court retains broad discretion in determining the admissibility of other acts evidence." United States v. Clark, 988 F.2d 1459, 1465 (6th Cir.) (per curiam), cert. denied, 114 S.Ct. 105 (1993). Other acts evidence is "admissible where it is sufficiently related to the crimes charged and shows their development." Id.
 
 
 54
 The evidence that defendant Manning placed assets in the names of other individuals in order to avoid detection or forfeiture of the assets if he were arrested was relevant and it was offered for a proper purpose; namely, to show motive and planning. The evidence not only shows defendant Manning's motive for joining the cocaine distribution conspiracy, i.e., the accumulation of ill-gotten gains, but also shows preparation and planning to shield against the loss such ill-gotten wealth. Further, there was little, if any, prejudicial impact stemming from the testimony concerning defendant Manning's financial transactions. Finally, defendant Manning chose not to seek a cautionary instruction. Accordingly, the district court did not abuse its discretion when it admitted this evidence.
 
 
 55
 Defendant Manning argues that evidence of his drug trafficking with Ismael Nunez was erroneously admitted as "other acts" evidence. Manning asserts that this evidence was "other acts" evidence because Nunez was never identified as a member of the conspiracy. However, defendant Manning's assertion is meritless. The evidence of Manning's dealings with Nunez was admissible under the co-conspirator exception of Fed.R.Evid. 802(d)(2)(E). William Echenique identified Nunez as a member of the conspiracy because Echenique testified that he was selling cocaine to Ismael Nunez. J.A. 419, 459, 469. Further, William Echenique identified Ismael Nunez as an alternate source of cocaine for defendant Manning. Specifically, Echenique testified that on one occasion he observed Nunez sell cocaine to defendant Manning and his brother Leon Manning. J.A. 485-86.
 
 
 56
 Defendant Manning also argues that the district court erred in admitting the testimony of DEA Agent Peters concerning Manning's flight at the time Peters attempted to arrest him. Defendant Manning did not object to the testimony of DEA Agent Peters at trial. Thus, the admission of this evidence can be reviewed only for plain error. See United States v. Segines, 17 F.3d 847, 851 (6th Cir.1994). Evidence of flight is admissible as an admission of guilt by conduct. United States v. Dillon, 870 F.2d 1125, 1126 (6th Cir.1989). "[T]he probative value of flight evidence 'depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged.' " Id. at 1127 (quoting United States v. Myers, 550 F.2d 1036, 1049 (5th Cir.1977). "All four inferences must be 'reasonabl[y] support[ed]' by the evidence." Id. (quoting Myers, 550 F.2d at 1049. "For flight evidence to be admissible, the timing of the flight must itself indicate the sudden onset or the sudden increase of fear in the defendant's mind that he or she will face apprehension for, accusation of, or conviction of the crime charged." Id. at 1128.
 
 
 57
 In this case, there can be no doubt that defendant Manning fled when DEA agents attempted to arrest him on March 2, 1993. Furthermore, prior to DEA Agent Peter's testimony, the parties stipulated that if Scott Pellerito had been called to testify as a witness at the trial in this matter, he would testify:
 
 
 58
 That I'm a deputy sheriff with the Kent County Sheriff's Department, that I've been employed by that agency for approximately eight years. In early March, 1993, I met with Leon Manning and his attorney regarding Leon's alleged involvement in cocaine trafficking. I advised Leon Manning that he was under investigation as was his half brother, Marcus Manning, and that indictments may be brought against them.
 
 
 59
 J.A. 1496. Deputy Sheriff Pellerito's statement to Leon Manning was made approximately two weeks prior to the attempted arrest of defendant Manning. Two weeks later, as law enforcement officers announced their presence at the scene and stated that they had an arrest warrant for defendant Manning, J.A. 1501, defendant Manning fled out the back window of an apartment, leaving behind his beeper and a jacket, J.A. 1503-04.
 
 
 60
 The circumstances of defendant's flight in this case clearly imply a consciousness of guilt. Furthermore, although defendant asserts that the government did not show that his flight was related to the conspiracy charged in this case, defendant Manning's assertion is meritless. Defendant Manning stated that the evidence of drug deals with Ismael Nunez, money laundering and making crack cocaine, are all separate from the crime charged in this case. However, all of this evidence was part of and in furtherance of the conspiracy charged in this case. As noted above, William Echenique identified Nunez as a member of the conspiracy and an alternate supplier of cocaine to defendant Manning. Further, Echenique also testified that Manning purchased white cocaine from him because it was easier to "cook" it into crack cocaine, and the only evidence of money laundering introduced by the government related to the attempted concealment of assets by defendant Manning. Thus, contrary to defendant's assertions, there was no evidence at trial of other crimes committed by defendant Manning which were not in furtherance of or related to the conspiracy to distribute cocaine charged in this case. Accordingly, the district court did not commit plain error in admitting the evidence of flight.
 
 
 61
 Defendant Manning asserts that the district court erred in admitting the testimony of DEA Special Agent David Munson as expert testimony on (1) the practices of drug traffickers, particularly the placement of assets under fictitious names in order to conceal them, and (2) the pattern of traffic associated with the homes of drug dealers; namely, a pattern of vehicular and pedestrian traffic making very short visits.
 
 
 62
 At trial, defendant Manning made no objection to Agent Munson's qualifications to give expert testimony. Accordingly, the admission of Munson's testimony can be reviewed only for plain error. " 'Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.' " United States v. Segines, 17 F.3d 847, 851 (6th Cir.1994) (quoting Fed.R.Crim.P. 52(b)). Before an appellate court may reverse a conviction on the basis of plain error: (1) "there must have indeed been an 'error;' " (2) "the error must be 'plain,' i.e., 'clear' or 'obvious;' " and (3) "the plain error must have affected 'substantial rights.' " Id. (quoting United States v. Olano, 113 S.Ct. 1770, 1777-78 (1993)). Furthermore, a court of appeals should use its discretion to "correct a plain forfeited error affecting substantial rights [only] if the error 'seriously affects the fairness, integrity or public reputation of judicial proceedings.' " Id. at 852 (quoting Olano, 113 S.Ct. at 1779).
 
 
 63
 "Admission of expert testimony is a matter within the broad discretion of the court ..." United States v. Pearce, 912 F.2d 159, 163 (6th Cir.1990), cert. denied, 498 U.S. 1093 (1991). "Law enforcement officers may testify [as experts] concerning the methods and techniques employed in an area of criminal activity and to establish 'modus operandi' of particular crimes. Knowledge of such activity is generally 'beyond the understanding of the average layman.' " Id. (quoting United States v. Espinosa, 827 F.2d 604, 611 (9th Cir.1987), cert. denied, 485 U.S. 968 (1988)).
 
 
 64
 In this case, the district court did not commit an error, plain or otherwise, in permitting Special Agent Munson to testify as an expert. Special Agent Munson testified concerning the methods and techniques employed in drug trafficking; namely, the placement of assets in other persons' names and the meaning of the large number of short term visitors at defendant Manning's residence. This testimony by Special Agent Munson put other trial testimony in context for the jury, and also showed that the actions of defendant Manning, such as placing assets in other persons' names, were not innocent behavior, but were related to and in furtherance of the conspiracy.
 
 
 65
 Finally, defendant Manning argues that the district court erred admitting testimony from Sheila Echenique concerning a statement made by William Echenique to her in which William Echenique identified defendant Manning as one of William Echenique's best customers during the course of the conspiracy. Defendant Manning argues that this statement was "idle chatter."
 
 
 66
 However, the statement is admissible under the co-conspirator exception of Fed.R.Evid. 801(d)(2)(E) as a statement made concerning a member of the conspiracy and in furtherance of the conspiracy. Vinson, 606 F.2d at 153. In this case, Sheila Echenique's own testimony establishes that she was a member of the conspiracy, functioning as William Echenique's bookkeeper and money handler. Further, as discussed above, defendant Manning was also a member of the conspiracy.
 
 
 67
 Moreover, William Echenique's statement to Sheila Echenique was unquestionably in furtherance of the conspiracy. "A statement is made 'in furtherance of' the conspiracy if it was intended to promote the conspiratorial objectives." United States v. Hitow, 889 F.2d 1573, 1581 (6th Cir.1989). "Statements that have been found to be 'in furtherance of' conspiracies include statements identifying other conspirators and their roles in the conspiracy, statements to inform other conspirators of the activities or status of the conspiracy, and statements as to the source or purchaser of controlled substances." Id. (citations omitted). Accordingly, defendant Manning's assertion that Sheila Echenique's testimony concerned "idle chatter" is meritless, and the trial court properly admitted her testimony.
 
 C.
 
 68
 Defendant Martin, Mayweather, and Manning assert that the district court committed reversible error when it denied their motions for severance. Defendant Manning made a pretrial motion to sever on September 21, 1993. During the course of the trial, counsel for defendants Manning, Mayweather and Martin made oral motions for severance. The district court denied all of the motions for severance, and there is no indication in the record that any of the defendants renewed their motions for severance at the close of all the evidence. Because defendants failed to renew their motions for severance at the close of all the evidence they have committed a waiver and our review of this issue is limited to plain error, see United States v. Swift, 809 F.2d 320, 323 (6th Cir.1987), using the standard set forth in United States v. Olano, 113 S.Ct. 1770 (1993). See Segines, 17 F.3d at 851-52.
 
 
 69
 Federal Rule of Criminal Procedure 8(b) "provides that joinder of defendants is permissible if they are alleged to have participated 'in the same series of acts or transactions constituting an offense or offenses.' " United States v. Warner, 690 F.2d 545, 551 (6th Cir.1992) (quoting Fed.R.Crim.P. 8(b)). "It is well settled that joinder is proper under Rule 8(b) where an indictment charges multiple defendants with participation in a single conspiracy." Id.
 
 
 70
 Furthermore, "a district judge's denial of a motion for severance ... is reversible only for an abuse of discretion." Id. "The defendant must make a showing of compelling prejudice before the trial court's ruling denying a [motion for] severance will be disturbed." Id. "To establish prejudice, a defendant must show that the jury is unable to separate and to treat distinctively evidence that is relevant to each particular defendant at trial." United States v. Paulino, 935 F.2d 739, 751 (6th Cir.), cert. denied. 502 U.S. 914 and 917 and 1014 (1991). "The burden rests with defendant to show such prejudice." United States v. Barrett, 933 F.2d 355, 362 (6th Cir.1991).
 
 
 71
 Moreover, "[e]ven if the defendant establishes some potential jury confusion, this must be balanced against society's need for speedy and efficient trials." Paulino, 935 F.2d at 751. Finally, in order for a severance, a defendant must show that he " 'will be unable to obtain a fair trial without severance, not merely that a separate trial will offer a better chance of acquittal.' " United States v. Abraham, 541 F.2d 1234, 1240 (7th Cir.1976) (per curiam) (quoting United States v. Blue, 440 F.2d 300, 302 (7th Cir.), cert. denied, 404 U.S. 836 (1971)), cert. denied, 429 U.S. 1102 (1977).
 
 
 72
 Thus, the joinder of defendants Martin, Mayweather, and Manning in one action was proper under Fed.R.Crim.P. 8(b) because the defendants were charged with participation in a single conspiracy. Defendant Mayweather asserts that he was prejudiced by the testimony of DEA Special Agent Gay concerning defendant Montoya's deal with Omar Santamaria to trade a Corvette for cocaine. However, there was no possibility of confusion present in this testimony because defendant Montoya was the only defendant who was identified as being involved in the reverse sting with Omar Santamaria.
 
 
 73
 Further, during trial all defense counsel made oral motions for severance based upon the perception that Agent Gay's testimony that defendant Montoya's attorney, Mr. Mirque, persisted in telling him that defendant Montoya's name was Angel Pabon somehow impugned the integrity of all defense counsel. Specifically, defendant Manning asserts that Agent Gay's testimony "suggested that defense counsel lacked integrity and that the defendants' defenses were equally fallacious." Brief of defendant Manning at 32. However, contrary to defendants' assertion, and the assertions of defendant Manning in particular, there has been no showing of any prejudice to any of defendants. Agent Gay did not testify that any of the defendants lied to him. Furthermore, Agent Gay did not actually testify that Mr. Mirque lied to him. As the district court noted in overruling the motion for severance, defendant Montoya was indicted as Angel Pabon in the original indictment in this case. Thus, the district court correctly stated: "There is no evidence in the record whatsoever that indicates that Mr. Mirque was doing anything other than using the name under which the defendant had been indicted. There has been no evidence that has been offered that Mr. Mirque knew that the alias was incorrect or, alternatively, there has been no evidence that has been offered that Mr. Mirque was taking any steps to affirmatively conceal the true name of Mr. Montoya, especially where, as here, Mr. Gay testified that he knew Mr. Montoya's real name ..." J.A. 1574.
 
 
 74
 Furthermore, there is a strong indication in the record that Agent Gay's testimony did not prejudice defendants. The acquittal of co-defendants Kevin Freeman and Nikolas Akrap shows that the jury was able to treat the evidence concerning each defendant separately during its deliberations.
 
 
 75
 Thus, the district court did not commit error in denying the motion for severance. Further, even were we to assume, arguendo, that the district court committed error in denying the motion for severance, the error would have been harmless, in light of the overwhelming evidence of defendants Manning's, Mayweather's, and Martin's guilt. See United States v. Davis, 809 F.2d 1194, 1207 (6th Cir.) ("[W]here there is 'overwhelming evidence of guilt', the claimed error [in denying a motion for severance] is harmless."), cert. denied, 483 U.S. 1007 and 1008 (1987).
 
 D.
 
 76
 Defendant Martin argues that his conviction should be reversed because he was denied the effective assistance of counsel. At trial, defendant Martin was represented by Attorney James Miller. On November 17, 1993, defendant Martin and attorney Miller requested that Miller be relieved of his duties as counsel. Defendant Martin told the court that he was dissatisfied with Miller's representation because Miller believed that based upon the evidence adduced at trial defendant Martin was likely to be found guilty, and he had advised Martin to accept a plea agreement from the government which would have resulted in defendant Martin receiving a sentence of five years incarceration in exchange for a plea of guilty. The district court denied the motion to relieve Miller, concluding that the advice that Miller had given defendant Martin was the type of advice which attorneys are required to give to their clients whether it is accepted or not, and also that there had been no showing that attorney Miller had a conflict of interest concerning his representation of defendant Martin or that defendant Martin and attorney Miller had irreconcilable differences.
 
 
 77
 On appeal, defendant Martin argues that attorney Miller made several errors which were beyond the range of professionally competent assistance. Specifically, he asserts that attorney Miller employed a cross-examination technique for William Echenique which drew repeated objections from the government and admonishments from the court. Defendant Martin also asserts that attorney Miller's opening statement failed to orient the jury to the issues of knowledge and agreement central to the conspiracy charge, and that attorney Miller's closing argument was beyond the bounds of competent representation because he referred to defendant Martin's religious beliefs. Further, defendant Martin asserts that attorney Miller failed to establish that he was incarcerated from January 8, 1991 to May 24, 1991, which would have shown that telephone calls which William Echenique had made to the home of Martin's sister could not have been intended for defendant Martin. Finally, defendant Martin asserts that attorney Miller rendered ineffective assistance when he failed to file a motion for a new trial under Fed.R.Crim.P. 33 within seven days of the jury's verdict.
 
 
 78
 "As a general rule, a defendant may not raise ineffective assistance of counsel claims for the first time on direct appeal, since there has not been an opportunity to develop and include in the record evidence bearing on the merits of the allegations." United States v. Wunder, 919 F.2d 34, 37 (6th Cir.1990) (per curiam). "The customary procedure followed in this situation ... is to permit the defendant to raise his ineffectiveness of counsel claim in a proper post-conviction proceeding under 28 U.S.C. Sec. 2255." Id. Moreover, where "the record is adequate to assess the merits of the defendant's allegations, [we] will consider them." Id.
 
 
 79
 In this case, the record is not sufficiently developed to permit an analysis of defendant Martin's claim of ineffective assistance of counsel. Accordingly, we conclude that defendant Martin's claim of ineffective assistance of counsel should be dismissed without prejudice.
 
 
 80
 In addition, defendant Mayweather argues that he was prejudiced by the ineffective assistance which attorney Miller rendered to defendant Martin. In his brief, defendant Mayweather does nothing more than reiterate various circumstances in which he asserts that attorney Miller was ineffective in his representation of defendant Martin. However, defendant Mayweather and defendant Martin were not represented by the same counsel, and defendant Mayweather makes no claim that his own counsel was ineffective or that his own counsel had a conflict of interest. Under the standard of Strickland v. Washington, 466 U.S. 668, 687 (1984), in order to establish ineffective assistance of counsel, "a criminal defendant must show both that his counsel's performance was deficient and that it prejudiced his defense in a manner which deprived him of a fair trial." Thomas v. Foltz, 818 F.2d 476, 480 (6th Cir.), cert. denied, 484 U.S. 870 (1987) (emphasis added). Since defendant Mayweather has not alleged that his counsel was ineffective, his claim of ineffective assistance of counsel is meritless.
 
 E.
 
 81
 Defendant Martin argues that the district court improperly applied the sentencing guidelines at his sentencing. Specifically, defendant Martin argues (1) that the district court erred in enhancing his sentence based upon his January 24, 1991 Michigan felony drug conviction of attempted delivery of cocaine, (2) that the district court should not have found him accountable for more than five kilograms of cocaine, and (3) that the mandatory minimum sentence in this case constitutes cruel and unusual punishment.
 
 
 82
 "We review a district court's factual findings in connection with sentencing under a 'clearly erroneous' standard, giving 'due deference' to the sentencing court's application of the guidelines to the facts. The application of the guidelines to an undisputed set of fact is, however, reviewed de novo." United States v. Sivils, 960 F.2d 587, 596 (6th Cir.), cert. denied, 113 S.Ct. 130 (1992) (citations omitted).
 
 
 83
 First, defendant Martin argues that the district court erred in sentencing him under the mandatory minimum sentencing provision of 21 U.S.C. Sec. 841(b)(1)(A)(ii) based upon his 1991 felony drug conviction in Michigan. The statute, 21 U.S.C. Sec. 841(b) provides in relevant part that
 
 
 84
 [i]f any person commits ... a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment which may not be less than 20 years and not more than life imprisonment...."
 
 
 85
 Defendant asserts that the district court erred in finding that defendant's prior Michigan conviction was not for a nonexistent offense and that his past guilty plea was not constitutionally infirm.[4] The district court found that
 
 
 86
 defendant had been charged with delivery under MCL [Sec.] 333.7401(2)(a)(iv), which includes attempted delivery under the definition in MCL [Sec.] 333.71051. In the transcript of this plea proceeding the defendant admitted that he possessed the cocaine involved in this underlying state proceeding with the intent to sell or deliver the cocaine. Here, although the argument could be made that perhaps the state judge should have been more clear as to whether the plea was being accepted under the express statutory provision for delivery and attempted delivery or the general criminal attempt statute where both are cited at the beginning of the transcript, it does appear clear to this court that the defendant pled guilty to an offense which in fact does exist under Michigan law.
 
 
 87
 The defendant next contends that even if the offense exists, which this court finds that it does, that the plea proceeding was insufficient and violated the defendant's constitutional rights because the defendant had not been properly advised of his rights by the state court judge. The defendant contends that the transcript which is attached to the defendant's sentencing memorandum, doesn't show that the defendant understood the law sufficiently to establish an intelligent and voluntary plea of guilty, that the court failed to confirm that defendant counsel had explained the charge to the defendant, and that the court did not elicit the element from the defendant that he was authorized or was not authorized to possess the controlled substance, in that case the cocaine.
 
 
 88
 The court has reviewed the transcript it its entirety and is satisfied that the defendant was in fact properly advised of his rights. The state court judge clearly advised him of his right to trial by jury, the right to be presumed innocent, the right to have the prosecutor prove each and every element beyond a reasonable doubt, his right and have witnesses appear at trial, the right to cross-examine each witness, the right to remain silent, or the right to testify at the trial if the defendant chose.
 
 
 89
 On page six of the transcript it also clearly indicates that the defendant was asked whether he had discussed the charges with his attorney, Mr. Cardinal, and that he had done so.
 
 
 90
 Finally, the transcript contains the defendant's own statement of what he did with respect to each of these offenses.
 
 
 91
 Viewing the transcript of the plea proceeding in its entirety, the court finds that there was no violation of the defendant's constitutional rights with respect to this plea proceeding. The defendant was, in fact, advised by the court of his rights; the defendant indicated that he had discussed the charges with his attorney; and, in this court's judgment, the plea proceeding was sufficient to withstand the collateral constitutional attack in this proceeding. Accordingly, the court finds that the defendant has not carried his burden this morning to establish the constitutional infirmity of this state court proceeding....
 
 
 92
 J.A. 1619-21.
 
 
 93
 A review of the transcript of defendant Martin's sentencing in state court reveals that the district court was correct in finding that defendant Martin's plea to the felony drug charge was voluntarily, knowingly, and intelligently made. See Boykin v. Alabama, 395 U.S. 238, 242-44 (1969).
 
 
 94
 Furthermore, the district court did not err in finding that defendant Martin pled guilty to an existing crime under Michigan law. In his state court sentencing, defendant Martin pled guilty to count III of an amended information which read:
 
 
 95
 Count III, Duncan Eric Martin did attempt to deliver less than 50 grams of a mixture containing the controlled substance of cocaine, contrary to MCL 333.7401(2)(a)(iv); MSA 14.15(7401)(2)(a)(iv), and did an act toward the commission of such offense but did fail in the perpetration of the same, contrary to MCL 750.92; MSA 28.287.
 
 
 96
 Transcript of state court sentencing at 4. At the defendant's state court sentencing, the prosecutor also stated that pursuant to a plea agreement between defendant Martin and the State of Michigan, counts I and II of the information against defendant Martin which involved charges of the "delivery of cocaine and conspiracy to deliver cocaine" would be dismissed. Id. at 8-9.
 
 
 97
 Defendant argues, and the government concedes, that under Michigan law the general attempt statute may not be used for attempted delivery of a controlled substance since the controlled substance statute itself expressly refers to attempt to deliver. People v. Wright, 253 N.W.2d 739, 740-741 (Mich.Ct.App.1977).
 
 
 98
 Count III of the amended information refers both to Michigan's Controlled Substances Act, M.C.L. Sec. 333.7401, and Michigan's general criminal attempt statute, M.C.L. Sec. 750.92. However, although Count III purports to refer to two statutory violations, one of the charges, violation of the general attempt statute, is nonexistent. Defendant can only then have pled guilty to the only valid crime contained in Count III of the amended information, a charge of attempted delivery of cocaine under Sec. 333.7401. Although the plea agreement provided for a sentence that was only available under the general attempt statute, Michigan could give defendant the benefit of that plea bargain if it chose without affecting any of defendant's fundamental rights. See People v. Chambers, 478 N.W.2d 709 (Mich.Ct.App.1991) (permitting without analysis a sentence under the general attempt statute for attempted possession of cocaine with intent to deliver.)
 
 
 99
 Defendant Martin next argues that the district court erred when it found that defendant Martin was responsible for more that five kilograms of cocaine for sentencing purposes under U.S.S.G. Sec. 2D1.1. "A district court's findings of fact on the amount of cocaine for which a defendant is to be held accountable are accepted by this court unless the findings are clearly erroneous." United States v. Jenkins, 4 F.3d 1338, 1344 (6th Cir.1993), cert. denied, 114 S.Ct. 1547 (1994). "[I]n the case of jointly undertaken criminal activity (whether or not charged as a conspiracy), the base offense level shall be determined on the basis of all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." Jenkins, 4 F.3d at 1347 (citing U.S.S.G. Sec. 1B1.3(a)(1)(B). At sentencing, the district court found that defendant was responsible for 5,168.76 kilograms of cocaine, which was reasonably foreseeable under U.S.S.G. Sec. 1B1.3 of the guidelines. J.A. 1618. Of this five kilograms of cocaine, one kilogram of cocaine was conversational cocaine; namely, the district court found that on October 20, 1991, defendant Martin sold one ounce of cocaine to a member of the vice squad of the Grand Rapids police department and that he told the officer that he could furnish the officer with one kilogram of cocaine. J.A. 1617. Defendant argues that this one kilogram of cocaine should not have been included under U.S.S.G. Sec. 2D1.1 because there was no indication that he was reasonably capable of producing one kilogram of cocaine when he talked to the police on October 20, 1991. Brief of defendant Martin at 41. In addition, defendant Martin argues that even if he is responsible for the one kilogram of cocaine, not all of it should be included in the five kilogram amount because to do so would be double counting. Id. See United States v. Gessa, 971 F.2d 1257, 1265-66 (6th Cir.1992) (en banc) (holding that a district court was required to include "conversational cocaine" in the determination under U.S.S.G. Sec. 2D1.1 unless "it finds that [a] defendant did not have the intention and was not reasonably capable of producing that specific amount").
 
 
 100
 In this case, the district court's finding that defendant was responsible for five kilograms of cocaine under U.S.S.G. Sec. 2D1.1 is not clearly erroneous. The court concluded that 1272.75 grams of cocaine which William Echenique testified that he delivered to Ben Maglichi were reasonably foreseeable to defendant Martin. Further, Echenique testified that he delivered one-half of a kilogram to Marcus Martin on four occasions, for a total of two kilograms, and that at least two of those deliveries were made in the presence of defendant Martin. Echenique also testified that he made two deliveries of four and one-half ounces of cocaine to defendant Martin and twice delivered nine ounces of cocaine to defendant Martin. Based upon this amount of cocaine, it was not unreasonable for the district court to conclude that defendant Martin was capable of producing the one kilogram of cocaine which he offered to sell to a member of the Grand Rapids police department.
 
 
 101
 Finally, defendant Martin argues that the application of the 20-year mandatory minimum sentencing provision of 21 U.S.C. Sec. 841(b)(1)(A)(ii) constitutes cruel and unusual punishment under the Eighth Amendment because the mandatory minimum sentence is disproportionate to his offense. In United States v. Dunson, 940 F.2d 989, (6th Cir.1991), cert. denied, 112 S.Ct. 1488 (1992), we held that the decision of the Supreme Court in Harmelin v. Michigan, 501 U.S. 957 (1991), "eliminate[d] any possible basis for supposing that [a 20-year sentence imposed under 21 U.S.C. Sec. 841(b)(1)(A)(ii) ] violates the Eighth Amendment's prohibition against cruel and unusual punishments." Dunson, 940 F.2d at 995. Accordingly, this claim is meritless.
 
 
 102
 In addition, defendant Miyares argues that the district court erred in enhancing his offense level by two levels based upon his role as a manager or leader in the drug conspiracy pursuant to U.S.S.G. Sec. 3B1.1(c). U.S.S.G. Sec. 3B1.1(c) states:
 
 
 103
 If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.
 
 
 104
 " 'It is well established in this Circuit that "enhancement pursuant to Sec. 3B1.1 requires the participation of at least two culpable individuals so that leadership of some criminal enterprise or organization, however minimal, can be claimed." ... But these principles do not mean that the defendant must directly employ or control a partnership or enterprise.' " United States v. Bashara, 27 F.3d 1174, 1182 (6th Cir.1994), cert. denied, 115 S.Ct. 909 (1995). " 'To be a manager, a defendant in a drug conspiracy need not control or manage the activities of the co-conspirators.... Id. at 1182. "[O]ne can be a 'manager' or 'supervisor' even when playing a role subordinate to other participants in the activity." Id. at 1182-83. "The commentary to U.S.S.G. Sec. 3B1.1 lists seven factors that may be considered in determining the extent of a defendant's role in the criminal activity: (1) the exercise of decision-making authority; (2) the nature of participation in the commission of the offense; (3) the recruitment of accomplices; (4) the claimed right to a larger share of the fruits of the crime; (5) the degree of participation in planning or organizing the offense; (6) the nature and scope of the illegal activity; and (7) the degree of control and authority exercised over others." Id. (citing U.S.S.G. Sec. 3B1.1, commentary application note 3). " 'There is no requirement, however, that each factor be met.' " Id. (quoting United States v. Ospina, 18 F.3d 1332, 1337 (6th Cir.), cert. denied, 114 S.Ct. 2721 (1994)).
 
 
 105
 The district court found that the two men supervised by defendant Miyares were the two "friends" of defendant Miyares who delivered a kilogram of cocaine from Chicago to Grand Rapids in late January 1991. William Echenique, Francisco Echenique, and Mark Pekovitch testified about the "two men." These two men followed William Echenique to Grand Rapids with a kilogram of cocaine in their car. This occurred the day after Echenique met with defendant Miyares at a restaurant in Chicago and Miyares agreed to sell nine ounces of cocaine to William Echenique. Not only did these two men follow Echenique to Grand Rapids with the kilogram of cocaine in their car, they assisted in dividing up the kilogram of cocaine by delivering nine ounces of the cocaine to Echenique, the day after they arrived in Grand Rapids. There was testimony that some of the nine ounces of cocaine were sold to defendant Mayweather. Further, Echenique subsequently recovered the remainder of the kilogram of cocaine and sold it.
 
 
 106
 Defendant Miyares alleges that the district court's finding that he managed or supervised these two men is clearly erroneous because (1) the two men were never identified and (2) there was never any showing that Miyares actually controlled these two men. However, the district court's finding that Miyares was the manager or supervisor of these two men was not clearly erroneous. After defendant Miyares told defendant Echenique that two of his "friends" would follow Echenique to Grand Rapids with a kilogram of cocaine and that Echenique would receive nine ounces of cocaine from the kilogram, the two men acted in compliance with defendant Miyares statements; namely, they acted as if they were following defendant Miyares' orders. Furthermore, it is irrelevant that the two men were never identified. They clearly were co-conspirators in the conspiracy involved in this case when they followed defendant Miyares' orders and transported a kilogram of cocaine to Grand Rapids, from which at least nine ounces were intended for distribution through the chain of the conspiracy. Accordingly, the district court did not err in enhancing defendant Miyares' offense level under U.S.S.G. Sec. 3B1.1.
 
 
 107
 Finally, defendant Miyares argues that the district court erred in enhancing his offense level by two levels for obstruction of justice under U.S.S.G. Sec. 3C1.1 based upon the district court's finding that he committed perjury in his trial testimony. In his testimony, defendant Miyares denied any involvement in the conspiracy charged in this case. The jury rejected Miyares' testimony and found him guilty. Defendant argues that his brief trial testimony did not impede or obstruct justice.
 
 
 108
 The district court's application of the enhancement under U.S.S.G. Sec. 3C1.1 was clearly consistent with the holding in United States v. Dunnigan, 113 S.Ct. 1111, 1117 (1993), in which the Supreme Court held that a district court must find a "willful intent to provide false testimony, rather than ... confusion, mistake or faulty memory" in order to enhance a sentence for the commission of perjury under U.S.S.G. 3C1.1. The Court also stated that it was preferable for the district court to make separate independent findings; however, the Court concluded that "where numerous witnesses ... contradicted [the defendant] regarding so many facts on which [he] could not have been mistaken, there [was] ample support" for the enhancement. Id.
 
 
 109
 Here, defendant Miyares' testimony was a direct effort to influence the jury and to obtain an acquittal. His denials were material to the issue of his guilt. Furthermore, although defendant Miyares derides the evidence of the government's witnesses as "the uncorroborated testimony of convicted drug dealers under hope of favor for their testimony," Brief of defendant Miyares at 18, based upon the overwhelming testimony against him, defendant Miyares could not have been mistaken or confused when he took the witness stand and denied his involvement in the conspiracy. Therefore, we conclude that the district court did not err in applying the two-level enhancement under U.S.S.G. Sec. 3C1.1.
 
 III.
 
 110
 For the reasons stated, the judgments of the district court are AFFIRMED in all respects, and defendant Martin's claims of ineffective assistance of counsel are DISMISSED without prejudice.
 
 
 
 *
 Honorable Thomas A. Wiseman, Jr., United States District Judge for the Middle District of Tennessee, sitting by designation
 
 
 [1]
 Of the remaining seven defendants named in the indictment, Mark Petkovitch and Marcus Martin pled guilty prior to trial pursuant to plea agreements with the government. Two other defendants, Kevin Freeman and Nikola Akrap were acquitted by the same jury which convicted the five defendants in this case. The final three defendants, Ovidio Montoya, Victor Ward, and Fernando "LNU" apparently are fugutives
 
 
 [2]
 Defendant Mayweather also argues that the prosecution did not produce all of the evidence set forth in its opening statement, and, consequently, that insufficient evidence was presented to support his conviction. Specifically, defendant Mayweather asserts that the government failed to prove that he was a street level dealer. However, as discussed below, this argument is meritless as sufficient evidence was presented to support defendant Mayweather's conviction. Furthermore, the evidence showed that defendant Mayweather obtained cocaine from William Echenique in amounts that exceeded what Mayweather would use for his own personal needs
 
 
 [3]
 The government argues, relying on the decisions in United States v. Woods, 544 F.2d 242, 251 (6th Cir.1976), cert. denied, 430 U.S. 969 (1977) and United States v. Colbert, 977 F.2d 203 (6th Cir.1992), that defendants have waived their right to argue that the evidence against them established multiple conspiracies, and not the single conspiracy charged in the indictment, because defendants failed to raise a multiplicity objection at trial. In Woods and Colbert, the defendants were charged with multiple counts of drug violations. At trial, the defendants did not raise a defense of "multiplicity;" namely, they failed to assert that "a single act of [narcotics] possession" had been "fragment[ed] into multiple counts." Woods, 544 F.2d at 251. However, in this case, defendants were charged with a single count of conspiracy. On appeal, their allegation that the government proved multiple conspiracies rather than a single conspiracy is essentially a challenge to the sufficiency of the evidence and not an assertion of "multiplicity or multipliciousness" of the charges in the indictment. Thus, we conclude that defendants have not waived this issue and decline to apply a plain error standard of review
 
 
 [4]
 The government argues that defendant Martin's collateral attack upon his prior Michigan conviction is barred by the Supreme Court's decision in Custis v. United States, 114 S.Ct. 1732 (1994). In Custis, the Court held that in a federal sentencing proceeding a defendant has no right to collaterally attack the validity of previous state convictions which are used to enhance his sentence under the Armed Career Criminal Act ("ACCA"), 18 U.S.C. Sec. 924(e), except for convictions obtained in violation of the right to counsel. Id. at 1734. In its decision in Custis, the Court drew a distinction between collateral attack of prior state convictions used to enhance sentences under the ACCA and collateral attacks on prior convictions used to enhance sentences under the drug laws. The Court noted that 21 U.S.C. Sec. 851(c), which is part of the Comprehensive Drug Abuse Prevention and Control Act of 1970, "sets forth specific procedures allowing a defendant to challenge the validity of a prior conviction used to enhance his sentence for a federal drug offense." Id. at 1736. The Court further stated that "the language of Sec. 851(c) shows that when Congress intended to authorize collateral attacks on prior convictions at the time of sentencing, it knew how to do so." Id. However, the Court went on to state that "Congress' omission of similar language in [the ACCA] indicates that it did not intend to give defendants the right to challenge the validity of prior convictions under this statute." Id. In this case, the government sought the enhancement of defendant Martin's sentence under the federal drug laws, not the ACCA. Thus, we conclude that the decision in Custis does not bar his collateral attack upon his prior state conviction