**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 15a0573n.06

**No. 13-5703**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Aug 13, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES |
| v. | ) | DISTRICT COURT FOR |
| | ) | THE MIDDLE DISTRICT |
| COREY LAMONT LANIER, | ) | OF TENNESSEE |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

**Before: BOGGS** and **KETHLEDGE**, Circuit Judges; and **BLACK**, District Judge.[*]

**BLACK**, District Judge.   A jury convicted Corey Lamont Lanier of three counts of conspiring to commit a Hobbs Act robbery in violation of 18 U.S.C. § 1951 and three counts of possessing and brandishing a firearm in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c).   Lanier appeals these convictions.   For the reasons that follow, we **AFFIRM**.

## I.   BACKGROUND

Law enforcement arrested Lanier in 2011, after he provided a false name and Social Security number.   Lanier agreed to provide information to law enforcement and

---

[*]   The Honorable Timothy S. Black, United States District Judge for the Southern District of Ohio, sitting by designation.

implicated himself in three armed robberies that occurred in 2009 at various locations in Nashville, Tennessee.

Lanier failed to cooperate fully and ultimately was charged in a superseding indictment with six counts of criminal activity related to the robberies: three counts of conspiring to commit a Hobbs Act robbery in violation of 18 U.S.C. § 1951 and three counts of possessing and brandishing a firearm in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c). Lanier unsuccessfully moved to suppress the statements he made to law enforcement.

The following testimony was elicited at trial:

*Hampton Lane Robbery*

In July or August 2009, armed men robbed the home of Markeith Davis and Lakeya Northern, located on Hampton Lane in Nashville. At the time of the robbery, Northern, Tamika Beard, and four children were inside the home. Beard testified that one of the men held her and the children at gunpoint. Northern recalled that one of the men took her to a bedroom and asked where the drugs and guns were located.

Davis testified that he was a drug dealer and that the robbers took approximately 4.5 ounces of crack cocaine and $4,000 in cash from his home. According to Davis, the stolen drugs and money were new product that he was about to sell and proceeds of prior drug transactions, respectively.

Shannon Wilson testified that he had told Lanier about this "lick" (opportunity to commit a robbery) on Hampton Drive and that he believed there would be a kilogram or more of cocaine at the location. Wilson recalled that he met with Lanier and "Shiest"

(Tony McColley) on the day of the robbery at Lanier's mother's house. Wilson explained that he was not present for this robbery because Davis knew his face.

In an interview with law enforcement, Lanier had indicated that he drove McColley to the house on Hampton Lane.[1] McColley confirmed that Lanier called him on the day of this robbery and said that he had a "lick" for them to do. McColley testified that they picked up two more men, Keyjuan Shaw and Joe Price, and drove to Lanier's mother's house, where Lanier obtained two guns and some bandanas. McColley, Shaw, and Price ran towards the residence and kicked in the door. McColley recalled that he, Lanier, Shaw, and Price split the crack cocaine and the money that they took from the house.

*Lebanon Pike Robbery*

On September 8, 2009, armed men robbed Phillip Ryan McGuire's home, located on Lebanon Pike in Nashville. At the time of the robbery, McGuire, his girlfriend Rachel Karnes, and two children were inside the home. McGuire stated that three men entered his home and that one of them approached him, put a gun to his chest, and asked where "it" was. The men made McGuire crawl on his stomach to locate money in the bathroom. Karnes testified that the robbers took approximately $12,000 to $15,000 in cash from the home. While testifying about the robbery and describing one of the robbers walking through the den, Karnes identified Lanier in the courtroom.

---

[1] Lanier did not testify at trial. However, the Government played his recorded interview with law enforcement for the jury.

McGuire testified that he dealt "Mexican Weed" on a regular basis, as his job. Some of the money that was stolen came from McGuire's drug dealing. McGuire planned to use the money that was stolen to buy more marijuana.

Shannon Wilson testified that he had told Lanier about the Lebanon Pike home. Wilson had known that McGuire was a drug dealer. Wilson indicated that he, "Crush" (Howard Coleman), Lanier, and "Tonk" drove to the house and that all but Coleman entered the house with firearms. Wilson testified that after the robbery, the four men went to a hotel and divided up the cash they took from the house. In his interview with law enforcement, Lanier described his participation in this robbery, along with that of Coleman and "Tonk."

Coleman testified as a defense witness. He explained that the day of the Lebanon Pike robbery, Lanier was recovering from a gunshot wound and on crutches, so he could not have participated in the robbery.

*Briarwick Drive Robbery*

On November 7, 2009, armed men entered Angela Rogan's home, located on Briarwick Drive in Nashville. At the time, Rogan was at her home with her son, Roshad Pitts. Rogan had been speaking to a man, later identified as Shannon Wilson, about buying a van. Pitts testified that Wilson came to the home and gave him some money for the van. Pitts explained that, when he realized that all of the money was not there, Wilson shoved a gun in his face and let two more men with guns into the home.

Rogan testified that her husband, Carlos, was a drug dealer who went to federal prison in 2003. Rogan stated that when Carlos went to prison, he left her $38,000 in

drug proceeds. Rogan testified that the men took her all over the house looking for guns and money. Law enforcement arrived at the scene and arrested Wilson and three others.

Rogan testified that she was in the process of establishing certain businesses prior to the Briarwick Drive robbery. She explained that she had purchased two vans, business cards, and advertising magnets with some of the money that her husband had left her. One of the vans was for a transportation business called Season Transportation, which would contract with TennCare to take patients from their homes to doctors' appointments. The other van was for a commercial cleaning business. Rogan explained that as a result of the home invasion, neither business was able to operate. Rogan was also conducting an illegal federal-income-tax scheme from her residence.

Wilson testified that he had called Lanier looking for a "lick" and that Lanier told him that he had one, but could not participate in it because the people in the house knew him. Wilson recalled that Lanier showed him the house on Briarwick Drive and supplied him with a gun for the robbery. Wilson testified that he, "E," Keyjuan Shaw, and "Weezy" entered the house with guns and attempted to rob it. In his interview with law enforcement, Lanier explained that he had received information from "Junior Mafia" (Gary Pitts, Jr.) that Rogan had $20,000 to $30,000 in a safe. Junior Mafia confirmed that he told Lanier about his aunt's house because Lanier had called him looking for a "lick."[2]

---

[2] Junior Mafia also testified that, as the time he informed Lanier of the Briarwick Drive location, he believed that Rogan was involved in a federal-tax scheme out of this house. Tony McColley also testified about a meeting between Lanier and Junior Mafia regarding a robbery that was to occur at one of Junior Mafia's relatives' houses.

A jury convicted Lanier on all counts, and the district court sentenced Lanier to 946 months of imprisonment.

## II.     ANALYSIS

Lanier argues that numerous errors require us to vacate his convictions. We address these alleged errors in turn.

### A.     Conspiracy Charges

Lanier argues that the Government proved only one overarching conspiracy to rob houses, not three separate conspiracies as charged.[3] Because Lanier failed to make this argument before the district court, we review for plain error. *United States v. Dunn*, 269 F. App'x 567, 573 (6th Cir. 2008). Plain error requires: (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) that "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *United States v. Cromer*, 389 F.3d 662, 672 (6th Cir. 2004) (quoting *Johnson v. United States,* 520 U.S. 461, 466–67 (1997)). A plain error is an error that is "clear" or "obvious." *United States v. Turek*, 563 F. App'x 469, 471 (6th Cir. 2014) (citing *Johnson,* 520 U.S. at 467).

"A single agreement to commit several crimes constitutes one conspiracy. By the same reasoning, multiple agreements to commit separate crimes constitute multiple

---

[3] In Count One of the superseding indictment, the grand jury charged Lanier with conspiring to commit a Hobbs Act robbery "[o]n or about September 8, 2009," at "a residence on Lebanon Pike, Nashville, Tennessee." In Count Three, the grand jury charged Lanier with conspiring to commit a Hobbs Act robbery "[b]etween in or around May, 2009 to in or around October, 2009," at "a residence on Hampton Lane, Nashville, Tennessee." In Count Five, the grand jury charged Lanier with conspiring to commit a Hobbs Act robbery "[i]n and around November, 2009" at "a residence on Briarwick Drive, Nashville, Tennessee."

conspiracies." *United States v. Broce*, 488 U.S. 563, 570–71 (1989). Thus, "the 'ultimate question is whether the evidence shows one agreement or more than one agreement.'" *Corral v. United States*, 562 F. App'x 399, 405 (6th Cir. 2014) (quoting *In re Grand Jury Proceedings,* 797 F.2d 1377, 1380 (6th Cir. 1986)).

In making this determination, we consider the totality of the circumstances, including the following factors:

> (1) time; (2) persons acting as co-conspirators; (3) the statutory offenses charged in the indictments; (4) the overt acts charged by the government or any other description of the offenses charged which indicates the nature and scope of the activity which the government sought to punish in each case; and (5) places where the events alleged as part of the conspiracy took place.

*United States v. Sinito*, 723 F.2d 1250, 1256 (6th Cir. 1983) (citations omitted). "Where several of these factors differ between the conspiracies, the conclusion follows that the alleged illegal conspiracies are separate and distinct offenses." *Id.* at 1256–57 (citations omitted).

Several of the *Sinito* factors counsel that there were multiple agreements to commit separate crimes and, therefore, multiple conspiracies. The agreements to commit these robberies, and the plans to execute them, were formulated at different times. Further, different persons agreed to participate in each robbery: Lanier, Tony McColley, Keyjuan Shaw, and Joe Price participated in the Hampton Lane robbery; Lanier, Howard Coleman, "Tonk," and Shannon Wilson participated in the Lebanon Pike robbery; and "E," Keyjuan Shaw, "Weezy," and Shannon Wilson participated in the Briarwick Drive robbery.

Each of these robberies stood on its own, and was neither dependent on the others for success, nor connected to the others by some larger plan. Lanier contends that he and Wilson had an ongoing agreement—essentially, that they would call each other when they had information of valuables at a home, either rob the place together or separately (depending on whether the victim knew either of them), and divide the profits. However, the fact that Wilson knew of, and told Lanier about, the Hampton Lane and Lebanon Pike "licks," and Lanier knew of, and told Wilson about, the Briarwick Drive "lick," is not dispositive. As is evident from the record, the three criminal episodes resulted from *separate agreements among different co-conspirators* and were *driven by perceived circumstantial opportunity, not a singular collaboration.* In fact, the conspiracies to rob homes on Hampton Lane and Lebanon Pike each had a distinct end, with a division of proceeds amongst the participants.

Because several of the *Sinito* factors differ between the conspiracies, and because evidence (and lack thereof) supports the conclusion that the robberies were not the result of a single agreement, but three separate agreements, we hold that it not was plain error for the district court to allow the Government to proceed with three distinct conspiracy charges.[4]

---

[4] Lanier relies on *United States v. Smith*, 320 F.3d 647 (6th Cir. 2003), to support his contention that there was only one overarching agreement and, therefore, only one conspiracy. In that case, the defendants unsuccessfully argued that the evidence proved three separate conspiracies, not a single conspiracy as charged. The court found that "a *reasonable juror could have found* that Smith and Crisp participated in a single conspiracy to extort banks." *Id.* at 654 (emphasis added). As in *Smith*, the standard of review plays an important role in the instant case.

## B.    Sufficiency of the Evidence

Lanier argues that his convictions must be vacated because the Government failed to prove a substantial effect on interstate commerce as to the Hobbs Act charges.   Lanier also argues that his conviction on the Section 924(c) charge related to the Briarwick Drive robbery must be vacated because the Government did not sufficiently prove the offense alleged.

"We 'review de novo a challenge to the sufficiency of the evidence supporting a criminal conviction.'"   *United States v. Howard*, 621 F.3d 433, 459 (6th Cir. 2010) (quoting *United States v. Carson,* 560 F.3d 566, 579 (6th Cir. 2009)).   In determining whether evidence is sufficient to support a conviction, we consider whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."   *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis in original).   "[A] defendant claiming insufficiency of the evidence bears a very heavy burden."   *United States v. Jackson*, 473 F.3d 660, 669 (6th Cir. 2007) (quoting *United States v. Abboud,* 438 F.3d 554, 589 (6th Cir. 2006)).   "[W]e do not weigh the evidence, consider the credibility of witnesses or substitute our judgment for that of the jury." *United States v. Hillard*, 11 F.3d 618, 620 (6th Cir. 1993).   We reverse a conviction only where we find that "judgment is not supported by substantial and competent evidence, whether direct or circumstantial, upon the record as a whole."   *United States v. Hall*, 549 F.3d 1033, 1040 (6th Cir. 2008) (citing *United States v. Barnett*, 398 F.3d 516 (6th Cir. 2005)).

### 1.     Hobbs Act Charges

The Hobbs Act provides, in relevant part:

Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a).   To prevail on a Hobbs Act charge, the Government must prove: "(1) interference with interstate commerce (2) in the course of a substantive criminal act." *United States v. Ostrander*, 411 F.3d 684, 691 (6th Cir. 2005).

As to the first element, "[i]f the victim of the robbery or violence is a business entity, the effect on interstate commerce need only be *de minimis*."   *Ostrander*, 411 F.3d at 691 (6th Cir. 2005) (citing *United States v. Smith,* 182 F.3d 452, 456 (6th Cir. 1999)). However, "when the Government seeks to satisfy the [Hobbs] Act's jurisdictional nexus by showing a connection between an individual victim and a business engaged in interstate commerce, that connection must be a substantial one—not one that is fortuitous or speculative." *United States v. Wang*, 222 F.3d 234, 239–40 (6th Cir. 2000); *see also United States v. Turner*, 272 F.3d 380 (6th Cir. 2001).

The Hobbs Act is meant to be construed broadly, to the full extent of Congress's Commerce Clause power.   *See Stirone v. United States*, 361 U.S. 212, 215 (1960). Accordingly, even "illegal commerce counts as commerce for Hobbs Act purposes." *Ostrander*, 411 F.3d at 692 (citations omitted).

The *Ostrander* case is instructive. There, the defendants argued that the government was required to show a substantial nexus with interstate commerce pursuant to *Wang* because the victim had acted as a private individual, buying drugs for his own purposes. 411 F.3d at 691. This court distinguished the *Wang* case on the ground that the victim in *Ostrander* "was a drug dealer; that was his business, and indeed he was the business." *Id.* Further, the government had offered evidence that the drugs that the victim sold had originated in Latin America and therefore had to have gone through interstate commerce to get to the victim, and that the robbery and murder obviously reduced the amount of drugs the victim could buy and sell in interstate commerce. *Id.* at 692; *see also United States v. Bailey*, 227 F.3d 792, 798 (7th Cir. 2000) (for purposes of the Hobbs Act, "robbery of cocaine dealers generally has an effect on commerce").

Lanier was charged, in part, with three *conspiracies to commit* Hobbs Act robberies. Markeith Davis and Ryan McGuire were active drug dealers, who had obtained drugs that had to go through interstate commerce. In fact, the conspirators intended to rob them *because of* their drug dealing. Because Davis and McGuire were engaged in the drug dealing business at the time of the robberies, the *Wang* private individual exception does not apply. Likewise, Carlos Rogan had been a drug dealer prior to his incarceration, and the conspirators sought to rob Angela Rogan because she possessed proceeds from drug sales. The nexus element as to this final robbery is further satisfied by evidence that Angela Rogan was in the process of establishing two businesses at the time of the robbery. Thus, the conspirators' objectives satisfy the *de minimis* interstate nexus requirement. *See Ostrander*, 411 F.3d at 692.

In fact, here, the conspirators actually impeded the victims' businesses (drug dealing, or otherwise). The conspirators stole new product that Davis intended to sell, as well as proceeds that McGuire intended to use for further drug purchases. In addition, Angela Rogan explained that, as a result of the Briarwick Drive robbery, neither of her businesses was able to operate. For these reasons, the Government carried its burden with respect to proof of the interstate-nexus requirement.

## 2.     Section 924(c) Charge—Count Six

Count Six of the superseding indictment charges Lanier with knowingly possessing and brandishing a firearm in furtherance of violence on or about November 17, 2009, the date of the Briarwick Drive robbery. To convict a defendant of possessing a firearm in violation of 18 U.S.C. § 924(c), the government must establish that the defendant "(1) 'possesse[d] a firearm' (2) 'in furtherance of'" the offense. *United States v. Tyus*, 379 Fed App'x 450, 451–52 (6th Cir. 2010) (quoting 18 U.S.C. § 924(c)(1), (2)).

Shannon Wilson testified that Lanier encouraged him to commit this robbery, having advised him that there would likely be a large sum of drug money at the targeted house and having shown him where the house was located. Significantly, Wilson testified that he approached Lanier to obtain a gun to be used during this robbery and that Lanier provided him with a gun, which he proceeded to use for this intended purpose.

Lanier need not have been physically present at the Briarwick Drive robbery, because the evidence supports a conviction on Count Six on the basis that Lanier aided and abetted the offense. *See, e.g., United States v. Lowery*, 60 F.3d 1199, 1202 (6th Cir. 1995). Lanier is also liable for the acts committed by Wilson, his co-conspirator, in

connection with this offense, so the evidence supports a conviction on this basis as well. *See, e.g., United States v. Lloyd*, 10 F.3d 1197, 1211 (6th Cir. 1993). For these reasons, Wilson's testimony is sufficient to support Lanier's conviction on Count Six of the superseding indictment.

### C. Admissibility of Evidence

Lanier argues that his convictions must be reversed because the Government was improperly permitted to present evidence regarding: (1) his agreement to, and subsequent failure to, cooperate with law enforcement; and (2) his prior bad acts.

"We review a district court's ruling on the admissibility of evidence for abuse of discretion." *United States v. Yu Qin*, 688 F.3d 257, 261 (6th Cir. 2012) (citing *United States v. Haywood,* 280 F.3d 715, 720 (6th Cir. 2002)). An abuse of discretion "is evident when the reviewing court is firmly convinced that a mistake has been made." *Ross v. Duggan*, 402 F.3d 575, 581 (6th Cir. 2004) (quoting *Graham–Humphreys v. Memphis Brooks Museum of Art, Inc.,* 209 F.3d 552 (6th Cir. 2000)). A court abuses its discretion when it "relies on clearly erroneous findings of fact, or when it improperly applies the law." *Id.* However, when a party does not object to the admission of an item of evidence, we review the admission of that evidence for plain error. *United States v. Moore*, 47 F.3d 1171, at *2 (6th Cir. 1995) (citing *United States v. Mendez-Ortiz*, 810 F.2d 76 (6th Cir. 1986)).

### 1.    Evidence of Lanier's Failure to Cooperate

Lanier argues that evidence related to his failure to cooperate was irrelevant to the charged offenses and that, even if it were relevant, its relevance was substantially outweighed by a danger of unfair prejudice.

Only evidence that is relevant is admissible at trial.    Fed. R. Evid. 402. Evidence is relevant only if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action."    Fed. R. Evid. 401.    Even relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice[.]"    Fed. R. Evid. 403.    "Unfair prejudice does not mean the damage to a [party's] case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest [a] decision on an improper basis."    *United States v. Newsom*, 452 F.3d 593, 603 (6th Cir. 2006).    A district court has broad discretion in making a Rule 403 determination.    *United States v. Bonds*, 12 F.3d 540, 567 (6th Cir. 1993).

At trial, the Government presented evidence that Lanier agreed to cooperate with law enforcement but ultimately failed to fulfill his commitment.    Scott Cothran testified that Lanier agreed to provide cooperation against his gang, the 98 Mafia Crips, and to provide information on drug sales and gun sales.    Cothran testified that shortly after Lanier got out of jail, he "just quit answering his phone" when law enforcement officials called.    This failure led to his indictment.    John Nokes testified that Lanier "had every opportunity to cooperate" but did not do so.    Mickey Welch testified that Lanier was

given the opportunity to cooperate but failed to contact investigators, even after they bought him minutes on his cell phone to facilitate communication.

The Government also elicited evidence as to the danger Lanier's failure to cooperate presented to the community. Specifically, Nokes testified that there were more gang members in the Nashville than police, and, therefore, Lanier could have been very helpful. Similarly, when asked whether Lanier's cooperation would have enhanced overall public safety, Welch replied, "Yes, absolutely."

Lanier argues that this evidence was irrelevant because his lack of cooperation did not make any fact related to his guilt more or less probable. Critically, though, Lanier expressed his intent to cooperate contemporaneously with his confession to his role in the charged crimes. Accordingly, the evidence provided context for Lanier's confession and allowed jurors to more comprehensively evaluate the credibility of the confession. Accordingly, we find that evidence related to Lanier's agreement to cooperate, and failure to do so, was relevant.[5]

Lanier also argues that he was prejudiced by the Government's implication that, while Lanier was given the opportunity to help an outmanned police force, he chose not to and, thereby, reduced overall public safety. The jury was instructed by the district court that its sole job was to decide whether the government had proven that the defendant guilty of the offenses charged, and that the defendant is not on trial for any other act or conduct. Juries are presumed to follow the instructions of the court. *See*

---

[5] Further, as the district court noted, defense counsel had raised the issue of the voluntariness of Lanier's confession at trial.

*Richardson v. Marsh*, 481 U.S. 200, 206-07 (1987). For this reason, even if the admission of this evidence were in error, the error was harmless.

### 2. Evidence Introduced During Howard Coleman's Cross-Examination

Lanier argues that his convictions must be vacated because the Government improperly introduced evidence that should have been excluded pursuant to Federal Rule of Evidence 404(b) during Howard Coleman's cross-examination.

"Rule 404(b) forbids admitting evidence of 'other crimes, wrongs, or acts' to prove the character of a person in order to show action in conformity with that character, but permits the introduction of character evidence for proper purposes, such as proof of motive, intent, knowledge, or absence of mistake." *United States v. Pope*, 335 F. App'x 598, 604 (6th Cir. 2009) (quoting Fed. R. Evid. 404(b)). When evaluating admissibility of prior acts evidence under Rule 404(b), a district court: (1) "must decide whether there is sufficient evidence that the other act in question actually occurred"; (2) "if so, . . . decide whether the evidence of the other act is probative of a material issue other than character"; and (3) "if the evidence is probative of a material issue other than character, . . . decide whether the probative value of the evidence is substantially outweighed by its potential prejudicial effect." *United States v. Clay*, 667 F.3d 689, 693 (6th Cir. 2012) (citation omitted).

Lanier called Howard Coleman to testify. During direct examination, Coleman testified that, on the day of the Lebanon Pike robbery, Lanier was recovering from a gunshot wound and on crutches, so he could not have participated in the robbery.

Coleman also testified that he had previously lied to law enforcement regarding Lanier's involvement in a different robbery.

On cross-examination, the Government attempted to impeach Coleman by asking about the false statement he made to law enforcement, specifically whether he said that Lanier sent someone to rob a person near a FedEx. Coleman testified that he may have said that. Coleman then testified that he did not remember who tried to carry out the robbery. The Government also asked about a robbery related to Archwood Apartments. At this point, the district court excused the jury and expressed concern that that the Government was getting too far afield. When the jury returned, the district court offered the following instruction:

> You have heard testimony by this witness about statements that he made to the government, and you have also heard testimony about specific statements he gave about the defendant involving other robberies. The Court is allowing this for the limited purpose of testing the credibility or the believability of this witness. You are not to consider those statements for the purpose of whether an actual offense was committed.

Subsequently, the Government asked about a robbery of "Lil' Ced." Defense counsel objected, and the district court sustained the objection. Later, the Government asked about the "Lil' Ced robbery" again; this time, Lanier's objection was overruled.

The Government's cross-examination of Coleman was targeted toward his credibility. Coleman was asked about evidence that undermined his testimony on direct—specifically, his prior statements regarding robberies carried out with Lanier—in order to impeach his testimony and attack his credibility. "[I]ssues of witness credibility are always open to cross-examination." *United States v. Arnott*, 704 F.2d 322, 324 (6th

Cir. 1983) (citations omitted); *see also* Fed. R. Crim. P. 611(b) ("Cross-examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility. The court may allow inquiry into additional matters as if on direct examination.")

Further, in raising the topic of Coleman's prior statements during direct examination, the defense opened the door to further examination on this same topic. *See United States v. Bender*, 265 F.3d 464, 471 (6th Cir. 2001) ("when a party opens up a subject . . . [the party] cannot complain on appeal if the opposing party introduces evidence on the same subject") (citation and internal quotation marks omitted).

In any event, Lanier fails to specify any *evidence* of prior bad acts that was improperly admitted or that was prejudicial. Instead, he complains of the Government's questioning. Coleman essentially testified that he did not remember past instances despite having described them on prior occasions. Furthermore, the district court cautioned the jury to consider evidence regarding Coleman's prior statements for the purpose of assessing his credibility *only*. For these reasons, we find that the relevance of this evidence was not substantially outweighed by prejudice to Lanier.

### D. In-Court Identification of Lanier

Lanier argues that the district court erred in allowing Rachel Karnes to identify Lanier as one of the assailants who robbed her home because, prior to the identification, she was shown a video in which Lanier confessed to the robbery. Because Lanier failed to object to the identification, we review for plain error. *United States v. Perry*, 438 F.3d 642, 649 (2006).

"The Due Process Clause prohibits the use of identifications which under the totality of the circumstances are impermissibly suggestive and present an unacceptable risk of irreparable misidentification." *Carter v. Bell*, 218 F.3d 581, 605 (6th Cir. 2000). "[A]n identification violates a defendant's right to due process where the identification procedure was so unnecessarily suggestive as to run the risk of irreparable mistaken identification." *Howard v. Bouchard*, 405 F.3d 459, 469 (6th Cir. 2005). "The due process concern is heightened when that misidentification is possible because the witness is called upon to identify a stranger whom she has observed only briefly, under poor conditions, and at a time of extreme emotional stress and excitement." *Ledbetter v. Edwards*, 35 F.3d 1062, 1070 (6th Cir. 1994).

While testifying on direct examination about the Lebanon Pike robbery and describing one of the robbers walking through the den, Karnes pointed her finger at the defendant. When asked to whom she was pointing, Karnes identified Lanier. On cross-examination, Karnes admitted that she was not able to identify Lanier until she saw a video of Lanier confessing to the crime. Karnes stated that she only assumed Lanier was the robber and explained, "I can't say 100 percent, because at that moment it was the most chaotic moment of my entire life." Karnes acknowledged that she could not recall Lanier walking in during the robbery, and that she only assumed it was him because he was present in court.

Lanier cannot show that his substantial rights were affected by Karnes's identification. Lanier's counsel instead effectively dealt with the issue on cross-examination, with the witness conceding that she could not positively identify

Lanier as the perpetrator and essentially recanting her identification. In reality, Lanier's conviction for the Lebanon Pike robbery was based on his own videotaped admission that he took part in this robbery, as well as corroborating evidence, including the testimony of his co-conspirators. Given the overwhelming evidence of Lanier's presence at and participation in this robbery, even if there were any error associated with Karnes's identification of Lanier, such error was harmless.

###### E.     The Superseding Indictment

Lanier argues that because charges of conspiracy and charges of Section 924(c) violations relating to the Briarwick Drive robbery were alleged in the original complaint, their inclusion in the superseding indictment violated the 30-day time limit imposed by the Speedy Trial Act.

Lanier waived this argument by failing to raise it before the district court. Federal Rule of Criminal Procedure 12 provides that motions alleging a defect in an indictment must be raised before trial. Fed. R. Crim. P. 12(b)(3)(B). We "strictly appl[y] Rule 12(b), and ha[ve] repeatedly held that failure to raise 12(b) motions in a timely fashion precludes appellate review." *United States v. Oldfield*, 859 F.2d 392, 396 (6th Cir. 1988) (citations omitted). Further, under the Speedy Trial Act, "[f]ailure of the defendant to move for dismissal prior to trial . . . shall constitute a waiver of the right to dismissal under this section." 18 U.S.C. § 3162(a)(2); *accord United States v. Brown*, 498 F.3d 523, 529–30 (6th Cir. 2007). Lanier did not move to dismiss the superseding indictment, so he cannot now argue that the district court erred in not granting a dismissal. Accordingly, Lanier's argument fails.

**F.    Denial of Lanier's Motion to Suppress**

Lanier argues that his convictions must be vacated because the district court erred in denying his motion to suppress evidence obtained after his detention, including his confession.    Specifically, Lanier argues that he was detained without reasonable suspicion.

In reviewing a district court's decision on a motion to suppress, "[w]e consider the evidence in the light most favorable to the party that prevailed at the district court and review factual findings for clear error."  *United States v. Young*, 707 F.3d 598, 602 (6th Cir. 2012) (citations omitted).    A factual finding is clearly erroneous only where "although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *Id.* (quoting *United States v. Smith,* 594 F.3d 530, 535 (6th Cir. 2010)).    We review legal determinations *de novo*.  *United States v. Gross*, 662 F.3d 393, 398 (6th Cir. 2011) (citation omitted).

At a hearing on Lanier's motion, Officer Joshua Baker testified that he was responding to a report of a speeding car when he encountered Lanier on March 10, 2011.  Baker approached Lanier without lights, sirens, or backup, asked for Lanier's identification, and asked whether Lanier had seen a speeding vehicle in the area.    Lanier provided false identifying information to the officer and was arrested for doing so.  Lanier presented an alternative account of events, but the district court did not credit his testimony.    The district court reasoned as follows:

> Based on proof, the Court finds that the Defendant was not subject to a *Terry* stop. Here, Baker was in the area to investigate a speeding vehicle. The Defendant conceded that vehicles drive through yards on this street to connect to another street. When Officer Baker first approached the Defendant, Baker was on the street inquiring whether Defendant observed the speeding vehicle. While on the street, Baker inquired about the Defendant's identity. Given the high crime area, Baker's inquiry about the Defendant's identity was reasonable, as conceded by Hempel, the defense investigator. Baker approached and arrested the Defendant only after the Defendant provided Baker a false name and social security number of a female. The Defendant testified that he provided false information to Baker about his identity. Officer Baker determined that the Defendant had committed criminal impersonation. At that point, Baker had probable cause to arrest the Defendant, prohibit the Defendant leaving the area, and approach the Defendant to place him under arrest. . . .

> The Court evaluates Officer Baker's objective behavior upon approaching the Defendant. Here, Officer Baker was alone and had not asked for back-up; did not activate his emergency lights or siren; did not draw his weapon, did not use mandatory language to suggest that the Defendant was compelled to provide identifying information; did not require the Defendant to exit his vehicle or remain present; and did not ask the Defendant to accompany him anywhere for further questioning. Thus, as in *Campbell*, the Defendant could have refused to provide the information and could have returned to his residence or departed.

The district court found that Baker merely inquired into Lanier's identity and did not issue any commands to Lanier or require him to remain present. Lanier does not explain how these factual findings are clearly erroneous.

We have held that "law enforcement officers may approach an individual and ask general questions without having any reasonable suspicion of criminal activity, so long as the officers refrain from the type of intimidating behavior that would lead a reasonable person to believe that the person was not free to leave." *United States v. Waldon*, 206 F.3d 597, 603 (6th Cir. 2000). Lanier notes that the vehicle in which he was sitting was parked in his own driveway and that the car did not match the description of the car Baker was looking for. However, Baker's testimony demonstrates that his initial

encounter with Lanier was non-confrontational, uncoerced, and consensual. As such, Baker's initial approach and question regarding whether Lanier had seen the speeding vehicle was within the ambit of consensual encounters that may be initiated without reasonable suspicion. Baker's actions, including his request for Lanier's identification, did not constitute a seizure under the Fourth Amendment. *See United States v. Drayton*, 536 U.S. 194, 200 (2002) (holding that bus passengers were not seized when, as part of a drug and weapons interdiction effort, plain-clothes police officers boarded the bus and began asking passengers questions). For these reasons, the district court did not err in denying Lanier's motion to suppress.

### G. Jury Instruction on Aiding and Abetting

Lanier argues that the jury was improperly instructed on aiding and abetting in relation to the Section 924(c) charges in light of the Supreme Court's decision in *Rosemond v. United States*, 134 S. Ct. 1240 (2014), a case decided after his trial.

We review jury instructions "as a whole to determine if they adequately inform the jury of the relevant considerations and provide a basis in law for aiding the jury in reaching its decision[.]" *United States v. Blackwell*, 459 F.3d 739, 764 (6th Cir. 2006) (citing *Romanski v. Detroit Entm't, LLC*, 428 F.3d 629, 641 (6th Cir. 2005)). We reverse a jury's verdict because of instructional error only "where the instruction, viewed as a whole is confusing, misleading, and prejudicial." *Id.* (citing *Romanski*, 428 F.3d at 641).

A person aids and abets a crime when, in addition to undertaking a requisite act in furtherance of the offense, the person intends to facilitate the commission of the offense. *Rosemond*, 134 S. Ct. at 1248. In *Rosemond*, the Supreme Court applied this principle

in the Section 924(c) context and held that, to satisfy the intent prong, a defendant must have advance knowledge that a firearm will be used or carried by a confederate. *Id.* at 1249. The Supreme Court vacated the judgment and remanded the case, having found that the district court erred in instructing the jury because it did not explain that the defendant needed advance knowledge of a firearm's presence. *Id.* at 1251.

Lanier argues that because there was no instruction that required the jury to find that he had knowledge of (and agreed to use) firearms *prior to* the robberies, his Section 924(c) convictions must be vacated. However, Lanier's case does not present the concern raised by the Supreme Court regarding an accomplice who "knows nothing of a gun until it appears at the scene." *Rosemond*, 134 S. Ct. at 1249. The district court instructed the jury that the government must prove "that the defendant did something to help or encourage the crime, with the intent that the crime be committed." Thus, whereas the district court in *Rosemond* narrowed the intent requirement in a manner that rendered *after-acquired* knowledge of a firearm sufficient,[6] this district court plainly instructed the jury that the defendant must have intended to commit or encourage this firearm offense and thereby ensured that Lanier would be convicted only if the intent prong were satisfied.

The district court further advised the jury that, as to the three counts brought pursuant to Section 924(c), "the government must prove that the defendant, as the

---

[6] The district court in *Rosemond* instructed the jury that it could convict if "(1) the defendant knew his cohort used a firearm in the drug trafficking crime, and (2) the defendant knowingly and actively participated in the drug trafficking crime." *Rosemond*, 134 S. Ct. at 1244 (citation omitted).

accomplice, associated and participated in the possession and brandishing of the firearm in connection with the underlying crime."[7]   This is consistent with Sixth Circuit precedent.  *See, e.g.*, *United States v. Gardner*, 488 F.3d 700, 712 (6th Cir. 2007); *United States v. Franklin*, 415 F.3d 537, 554 (6th Cir. 2005).   Nothing in *Rosemond* suggests that a defendant who associated and participated in the use of the firearm should not be found guilty of aiding and abetting.   For these reasons, the district court's instruction adequately informed the jury of the relevant considerations and was neither misleading nor prejudicial.[8]

## H.   Cumulative Effect of Claimed Errors

In his final assignment of error, Lanier argues that the cumulative effect of his claimed errors requires that his convictions be vacated.   Because we do not find that district court erred in any respect, Lanier's argument fails.

## III.   CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's judgment of conviction.

---

[7]  This instruction follows Sixth Circuit Criminal Pattern Jury Instruction 4.01.

[8]  In any event, the Government presented evidence that Lanier had advance knowledge of (and personal involvement with) the firearms used in each of the robberies.   Co-conspirator Tony McColley testified that Lanier provided guns to be used during the Hampton Drive robbery. Co-conspirator Shannon Wilson testified that Lanier: (1) provided the guns to be used during the Briarwick Drive robbery; and (2) personally brandished a gun during the Lebanon Pike robbery.