NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0023n.06

Nos. 17-5642 & 17-5973

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jan 15, 2019
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff-Appellee, | ) |
| | ) ON APPEAL FROM THE |
| v. | ) UNITED STATES DISTRICT |
| | ) COURT FOR THE EASTERN |
| MELINDA J. CAMPBELL (No. 17-5642); | ) DISTRICT OF KENTUCKY |
| ELLIOT CAMPBELL (No. 17-5973), | ) |
| | ) |
| Defendants-Appellants. | ) |

Before: CLAY, KEITH, and NALBANDIAN, Circuit Judges.

NALBANDIAN, Circuit Judge. When it comes to Melinda and Elliot Campbell—think Bonnie and Clyde. But rather than rob banks, the Campbells targeted the trucking industry. The couple's con went as follows: they created fake shipping companies, persuaded third parties to hire them to deliver cargo, and then held the shipments as hostage until the third parties paid ransom for the deliveries. The government charged the Campbells with six counts of wire fraud, one count of conspiracy to commit wire fraud, and one count of conspiracy to commit extortion. After a five-day trial, a jury convicted the Campbells.

The Campbells now appeal several aspects of their convictions. Melinda argues that there was not sufficient evidence to convict her of conspiracy under the Hobbs Act—and that the district court incorrectly calculated her "loss amount" at sentencing. And both Melinda and Elliot argue that Count 8 (conspiracy to commit extortion) was duplicitous and thus unconstitutional. But because we answer all these questions in favor of the government, we affirm.

## I.

The Campbells operated various trucking companies in Kentucky. Bryan Napier worked for the Campbells as a dispatcher. This meant that Napier found cargo for the Campbells' trucks to deliver from point A to point B. And then the Campbells (with Napier's help) entered into contracts with various shipping companies to deliver the cargo.

But to induce the shippers to enter into these contracts, the Campbells made "false representations and/or promises" which they "never actually intended to comply [with]." (Presentence Investigation Rep. ("PSR"), R. 261 ¶ 10.) For example, the Campbells agreed to meet certain conditions, such as providing proof of a trucking license, insurance, and tax forms; using several drivers to make deliveries within a specific time frame; and covering the cargo with a tarp. (Napier Trial Test., R. 212 at 43–47.) The Campbells also "promised to deliver [the cargo] *before* getting paid." (*Id.* at 48 (emphasis added).) But once the shippers were duped, the Campbells failed to follow these conditions.

Instead, contrary to the contracts, the Campbells "requested to be paid before they delivered [the] cargo." (*Id.* at 86.) And if a shipper refused to pay up front, the Campbells would hold the cargo until the shipper paid. The Campbells would instruct their driver to stop the truck and "not to deliver until [the Campbells] told them to deliver." (*Id.*) As the district court explained, the "customers were afraid that they would suffer economic harm if they refused to pay the Campbells before delivery"—such as losing money, future business, or incurring liability to their own customers. (Opinion, R. 162 at 5.) Eventually, once the customer gave-in and "paid a new rate, a

higher rate," the Campbells would instruct the driver to complete the delivery. (Napier Trial Test., R. 212 at 155.) The government identified at least 69 victims who lost money under the Campbells' scheme.

The Campbells also instructed the drivers to "rejigger" loads. (*Id.* at 89.) This meant that shippers would pay the Campbells extra to deliver cargo exclusively with no other cargo on the truck. But after agreeing to this condition, the Campbells instructed their drivers to comingle other cargo on the truck—and deliver the additional cargo first to "make it look like they had complied with that requirement." (*Id.*; PSR, R. 261 ¶ 12 (explaining that the Campbells also lied about the number of drivers in each truck).)

The Campbells prolonged their con by creating fake company names and fake employee names. The Campbells then used these fake names to falsify government forms and insurance documents. And they would conceal the previous aliases when they received complaints, starting over with new (but still fake) companies. (*See also* Appellee's Br. at 6 ("Misleading paperwork was also provided to the brokers, as well as altered Insurance forms showing excess insurance coverage that did not exist.").)

In September 2014, the government indicted the Campbells on six counts of wire fraud, one count of conspiracy to commit wire fraud, and one count of conspiracy to commit Hobbs Act extortion. The Campbells went to trial and tried to explain their conduct (arguments they renewed in their post-trial motion). The Campbells' defense relied on the general rule that a trucking company retains a "carrier's lien" on a shipment—which allows the carrier to keep the shipment

until the customer pays. *See* 49 U.S.C. § 13707(a). According to the Campbells, they lawfully refused to deliver cargo—under these default carrier's liens—until their customers paid. And Napier and Elliot each testified that, if a dispute arose, he believed he had a legal right to withhold delivery.

The jury convicted the Campbells and the district court denied the motion for judgment notwithstanding the verdict. In doing so, the district court explained that "at first glance, it seems like the Campbells have a compelling argument." (Opinion, R. 162 at 6.) But the parties could give up their right to a carrier's lien. And that is exactly what the Campbells did here. In their contracts, the Campbells explicitly waived any carrier's lien and promised to demand payment "within twenty days from the receipt [of cargo]." (*Id.* at 6–7 (brackets omitted); Contract Carrier Agreement, R. 120-4 ¶ 5 ("Carrier shall have no lien, and hereby expressly waives it right to any lien on any cargo, freight or other property of Broker or any of its customers.").) The district court found that "[a]s a result of these contractual terms, the default rules . . . no longer applied . . . [and] the Campbells had no legal right to demand payment from their customers up front." (Opinion, R. 162 at 7.) In other words, once the Campbells gave up their right to a carrier's lien, it became unlawful for them to refuse to deliver cargo until their customers paid.

The district court then went to sentencing. According to the PSR, Melinda was responsible for $238,197.99 in losses. Under the United States Sentencing Guidelines, this caused a 10-level increase to Melinda's offense level. *See* U.S.S.G. § 2B1.1(b)(1)(F). But Melinda objected to including around $90,000 of that, which if sustained, would have resulted in only an 8-level

increase. *See id.* § 2B1.1(b)(1)(E). Melinda argued that these losses stemmed from an unrelated trucking accident (and insurance dispute)—and not from the fraudulent trucking scheme itself. The district court disagreed, explaining that "it is clear to the Court that insurance was part of the Campbells' criminal activity." (Sentencing Hr'g, R. 262 at 18.) And so the district court found that these insurance losses—even if they resulted from an accident—were reasonably foreseeable, because "[o]ne of the ways that [the Campbells] tricked customers into doing business with them was by claiming that they had insurance when they, in fact, did not." (*Id.*) The district court sentenced Elliot and Melinda to fifty-six months in prison.

## II.

We start with Melinda's individual objection under the Hobbs Act. A jury convicted Melinda for conspiracy to commit extortion. But she now argues that "[t]he government's proof at trial failed to prove the elements of extortion." (JNOV Mot., R. 150-1 at 1.) Said another way, Melinda argues that there was insufficient evidence for the jury to convict her for conspiracy under the Hobbs Act.

Before going further, we note that Melinda has a "very heavy burden" to overcome. *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir. 1986). This is because we review her "sufficiency of the evidence claim by determining whether, 'after viewing the evidence in a light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Valenzeno*, 123 F.3d 365, 368 (6th Cir. 1997) (quoting *United States v. Collins*, 78 F.3d 1021, 1030 (6th Cir. 1996)). We must "resolve all

reasonable inferences in favor of the government," and we must not "reweigh the evidence, reevaluate the credibility of the witnesses, or substitute our judgment for that of the jury." *United States v. Wesley*, 417 F.3d 612, 617 (6th Cir. 2005) (citations omitted). And "[c]ircumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *Vannerson*, 786 F.2d at 225. Melinda cannot overcome this considerable burden.

The Hobbs Act makes it unlawful for anyone to conspire to "obstruct[], delay[], or affect[] commerce" by "robbery or extortion." 18 U.S.C. § 1951(a). "Extortion" means "the obtaining of property from another, with his consent, induced by the wrongful use of actual or threatened force, violence, or fear." *Id.* § 1951(b)(2). And "fear" includes the "fear of economic harm"—which means that "the victim believes that the defendant can exercise his or her power to the victim's economic detriment." *United States v. Kelley*, 461 F.3d 817, 826 (6th Cir. 2006). In sum, to convict Melinda for conspiracy to commit extortion, the government needed to prove that Melinda agreed to take money from the victims by wrongfully making them fear economic loss.

According to Melinda, there was insufficient evidence that (1) the Campbells put the alleged victims in fear of economic loss, (2) the Campbells knew that their conduct was unlawful, and (3) she joined the conspiracy. Melinda raised the first two arguments in the district court (along with two other arguments since abandoned). But Melinda did not argue that the government failed to prove that she joined the conspiracy. Thus, Melinda waived this argument. *See Wesley*, 417 F.3d at 617 (relying on *United States v. Dandy*, 998 F.2d 1344, 1356–57 (6th Cir. 1993)

6

(explaining that, when making a Rule 29 motion "on specific grounds," a defendant waives "all grounds not specified in the motion")).

Still, even if Melinda had not waived her third argument, sufficient evidence showed that she participated in the conspiracy. Melinda handled the financial information, paid drivers, and provided administrative support for the scheme. Melinda also filled out fraudulent forms, used fake names and aliases, opened bank accounts, and filed articles of incorporation for some of the fake companies. Indeed, testimony from both Napier and Agent Hubbuch confirmed that "Melinda handled most of the finances and the paperwork" in the conspiracy. (Napier Test., R. 212 at 50; Agent Hubbuch Test., *id.* at 266–68.)

There is also sufficient evidence that the Campbells put their victims in fear of economic loss. One victim, Richard Carlisle, testified that he felt like he had "no choice" but to pay the Campbells' ransom to deliver his cargo. (R. 158 at 27–39, 35–26.) Carlisle was afraid he would incur hundreds of thousands of dollars in liability if the Campbells failed to make his delivery as promised. Carlisle's fear materialized when he lost customers following shipping delays because, as his customers explained, the Campbells were "a poor carrier . . . and a bad choice." (*Id.* at 35.)

Another victim, Josh Bell, said that he "panicked" when the Campbells demanded additional payments. (R. 213 at 112, 119–120.) The Campbells never mentioned a carrier's lien. Instead, they "just demanded to be paid." Bell testified that he "had no choice but to go out on limb and trust that [the Campbells were] going to make delivery once we paid [them]"—and that he was "extremely" concerned about "[p]otential lost revenue." (*Id.* at 119.)

7

Christina Friend was another victim of the Campbells. Friend testified that she also lost customers because of the Campbells' tactics. Friend even filed a complaint with the Department of Transportation after the Campbells demanded advanced payment. As these victims' testimony shows, the government introduced ample evidence that the Campbells put their victims in fear of economic loss.

Finally, Napier confirmed that the Campbells knew their conduct was unlawful. Napier explained that the Campbells would stop the trucks, demand payment before delivery, and "instruct [the drivers] not to deliver" until the customers paid "a new rate, a higher rate." (R. 156 at 50–51, 118.) The government also introduced evidence that the Campbells waived any right to a carrier's lien, created fake company names and employee names, and used aliases to register fake companies by submitting falsified forms. The Campbells also lied about trucking insurance, the conditions of delivery, and why the deliveries were late.[1] (R. 156 at 43–44 (explaining that customers complained and would try to contact the drivers, but the Campbells gave the drivers excuses and lies to tell the customers).)

---

[1] Melinda does not argue that this circumstantial evidence cannot support the jury's verdict. Instead, she disagrees with how we should characterize the evidence. (*See* Melinda's Br. at 22 ("Such fraudulent acts to conceal the Campbells' companies bad reputation . . . in no way establish the Campbells' wrongful intent to commit extortion.").) But as we explained, we must not "reweigh the evidence, reevaluate the credibility of the witnesses, or substitute our judgment for that of the jury." *Wesley*, 417 F.3d at 617. And "[c]ircumstantial evidence alone is sufficient to sustain a conviction." *Vannerson*, 766 F.2d at 225; *United States v. Butler*, 618 F.2d 411, 414 (6th Cir. 1980) ("Proof of the requisite knowledge and intent on the part of conspirators need not be made by direct evidence. Rather, circumstantial evidence or permissible inferences or deductions from facts are sufficient to make a showing of conspiracy [under the Hobbs Act].").

To be sure, Melinda is correct that there is *some* evidence and testimony that supports her argument. For example, some victims testified that they did not read the contracts and that sometimes the parties waived contractual provisions. The Campbells also tried to deliver cargo to customers at a police station. And according to both Napier and Elliot, if a dispute arose, they believed they had a legal right to withhold delivery.

But this counter-evidence simply means, at most, that the jury heard conflicting evidence. Faced with this two-sided record, the jury was free to weigh the evidence, make credibility determinations, and reach its verdict. And in such a situation, we cannot substitute our judgment for that of the jury. There was sufficient evidence for the jury to convict Melinda for conspiracy under the Hobbs Act. This is especially true after we view—as we must—the evidence in a light most favorable to the prosecution. Melinda's first objection under the Hobbs Act is not a winner.

## III.

Elliot joins Melinda for her second objection under the Hobbs Act. The Campbells argue that we should vacate their convictions under Count 8, conspiracy to commit extortion, because the indictment was duplicitous. Count 8 charged the Campbells with "conspir[ing] to obtain the property of Bolt Express, LLC, Friend's Express, LLC, JB Express, Inc., and Lion Logistics Inc." in violation of the Hobbs Act. (Indictment, R. 1 ¶ 19.) According to the Campbells, Count 8 charged the Campbells with four different conspiracies—one for each victim listed. If the Campbells are correct, the jury's general verdict could violate the Campbells' Constitutional right to a unanimous verdict because the jury did not explicitly find that the Campbells conspired to

extort any specific victim. But if Count 8 charged the Campbells with just one overall conspiracy, there is no constitutional problem with the verdict.[2] Thus, as a threshold issue, we must determine whether Count 8 is duplicitous. This means that we must determine whether Count 8 sets forth one crime, or instead, "sets forth separate and distinct crimes in one count." *United States v. Kakos*, 483 F.3d 441, 443 (6th Cir. 2007) (quotation marks and citations omitted).

The Campbells did not raise this issue below. Nor did they object to the jury instructions, which did not cure the allegedly faulty indictment. Thus, we review this issue for plain error. *Id.* at 445 (citing *United States v. Lloyd*, 462 F.3d 510, 514 (6th Cir. 2006)). In any event, the district court committed no error here—plain or otherwise.

When the crime charged is a conspiracy, the general rule is that "[a] single agreement to commit several crimes constitutes one conspiracy." *United States v. Lanier*, 623 F. App'x 768, 773 (6th Cir. 2015) (quoting *United States v. Broce*, 488 U.S. 563, 570–71 (1989)). But where there are "multiple agreements to commit separate crimes," then there are several conspiracies. *Id.*

---

[2] For example, picture the twelve jury members separated into four groups—each group containing three jurors. A hypothetical situation could arise where one group thought that the Campbells conspired against Bolt Express. Another group thought that the Campbells conspired against Friend's Express. The third group thought the Campbells conspired against JB Express. And the last group thought the Campbells conspired against Lion Logistics. If Count 8 charged the Campbells with four distinct conspiracies (each tied to a specific victim), this creates a problem because, while all twelve jurors agree that the Campbells conspired to commit extortion, there is no unanimous agreement that the Campbells conspired against any one victim. And there is no way to know what the jury thought because the verdict form simply asked the jury to check "guilty" or "not guilty" under Count 8. But this hypothetical problem disappears if Count 8 charged the Campbells with just one overall conspiracy to commit extortion. Irrespective of the specific victims, the jury unanimously agreed on this broader issue.

(quoting *Broce*, 488 U.S. at 570–71). "[T]he ultimate question is whether the evidence shows one agreement or more than one agreement." *Id.* (quoting *Corral v. United States*, 562 F. App'x 399, 405 (6th Cir. 2014) (quotation marks omitted)).

Here, the evidence established one overall agreement. Elliot used the internet to "search for loads for his drivers." (PSR, R. 261 ¶ 23.) Then, using one of the Campbells' various fake companies, Elliot would arrange for a driver to deliver cargo. But "75 to 80 percent of the time," Elliot would "provide [the driver] instructions [to] delay . . . a delivery until payment was received." (*Id.* ¶ 25.) Meanwhile, Melinda "was responsible for handling the financial . . . and administrative aspects" of the conspiracy. (*Id.* ¶ 27.) This included creating the fake names, paying the drivers, establishing bank accounts, and filing paperwork for the various aliases. None of this conduct was victim-specific.

This conduct fits with our previous cases, where we describe a "single 'chain' conspiracy." *United States v. Mayweather*, 57 F.3d 1071 (6th Cir. 1995) (table). This occurs when "[s]eemingly independent transactions may be revealed as parts of a single conspiracy by their place in a pattern of regularized activity involving a significant continuity of membership." *Id.* (quoting *United States v. Grassi*, 616 F.2d 1295, 1303 (5th Cir. 1980)); *see also Lanier*, 623 F. App'x at 773 (quoting *United States v. Sinito*, 723 F.2d 1250, 1256 (6th Cir. 1983) (explaining that the totality of the circumstances—including the continuity of time, actors, offenses, and overt acts—supports one conspiracy to commit several crimes)). Said another way, although Count 8 identified four

specific victims, the Campbells' pattern of conduct reveals "one large scheme." *Kelley*, 461 F.3d at 830.

In contrast, the Campbells fail to explain their allegedly independent conspiracies. At most, Melinda relies on one case to support her argument that Count 8 charged several conspiracies, *United States v. Gordon*, 844 F.2d 1397 (9th Cir. 1988). In *Gordon*, the indictment charged the defendants with one count of conspiracy to commit offenses against the United States, which included: "To defraud the United States . . . under the Trident Ballistic Missile Program" and "[t]o conceal, cover up; and obstruct an investigation by th[e] Grand Jury into that wrongdoing." *Id.* at 1401. The Ninth Circuit found this count duplicitous because the defendants entered into two distinct agreements. The defendants' primary agreement was to use inside information to secure government contracts under the Missile Program. But the "conspiracy to obstruct justice was pursuant to a separate agreement, made after [a defendant] was subpoenaed by the grand jury." *Id.* (explaining that there was no evidence to suggest that the defendants' initial agreement also contained a "subsidiary conspiracy to conceal the crime"). Thus, the two agreements required separate conspiracy counts in the indictment: one for the original crimes— and another for the cover-up.

But here, Count 8 did not allege that the Campbells conspired to commit their crimes *and* to cover-up their crimes. So *Gordon* does not help the Campbells. Instead, *Gordon* supports our conclusion that the Campbells had one broad conspiracy. In *Gordon*, the defendants' scheme enabled them to secure several "subcontracts to the exclusion of competitive bidders." 844 F.2d

at 1399. But each subcontract did not create a separate conspiracy against the government or the bidders. Instead, the defendants' overall scheme to repeatedly (and improperly) secure government contracts created one conspiracy. *See id.*

As in *Gordon*, the Campbells did not engage in a separate conspiracy for each trucking victim. Instead, the Campbells' overall scheme to use fake companies and false promises to secure contracts and defraud shippers was one continual conspiracy. Thus, Count 8 in the indictment was not duplicitous.[3] We affirm the Campbells' convictions under the Hobbs Act.

**IV.**

Melinda's final objection is that the district court incorrectly calculated her "loss amount" at sentencing. According to the PSR, Melinda was responsible for $238,197.99 in losses for her role in the conspiracy. (R. 261 ¶ 34.) Under § 2B1.1(b)(1)(F) of the Sentencing Guidelines, this caused a 10-level increase to Melinda's offense level. But Melinda objected to including around $90,000 of the loss amount, which if sustained, would have resulted in only an 8-level increase. *See* § 2B1.1(b)(1)(E). Melinda argued that the $90,000 in losses resulted from an unrelated trucking accident (and insurance dispute). She characterizes these losses as "insurance disputes that can be and often are incurred by any legitimate business." And so, Melinda argues that her fraudulent activity did not cause these otherwise routine insurance losses. We will not overturn

---

[3] For the same reasons, the Campbells "cannot demonstrate that the district court's failure to give a special unanimity instruction constituted plain error." *Kakos*, 483 F.3d at 446 (summarily resolving jury instruction question along with duplicitous question when the defendant "does not suggest any reason why a special unanimity instruction was necessary that is independent of [the] argument that the indictment was duplicitous").

the district court's findings under the Sentencing Guidelines "unless clearly erroneous." *United States v. Guthrie*, 144 F.3d 1006, 1011 (6th Cir. 1998).

Melinda mainly relies on *United States v. Rothwell*, 387 F.3d 579 (6th Cir. 2004). In *Rothwell*, we explained that "the Sentencing Guidelines import the legal concept of a causal relationship between the defendant's conduct and the determined loss." 387 F.3d at 583. "For an actual loss to be attributed to a defendant for sentencing purposes, the district court must determine by a preponderance of the evidence that a defendant is both a 'but for' and proximate cause of this loss." *United States v. Selgjekaj*, 678 F. App'x 379, 388 (6th Cir. 2017) (citing *Rothwell*, 387 F.3d at 582–83). Such a finding was absent in *Rothwell*—and we reversed the district court—because it failed to explain how the defendant's conduct made it more likely that the losses at issue would occur. *See* 387 F.3d at 584.

But here, the district court explained the connection between Melinda's fraud and the insurance losses: "it is clear to the Court that insurance was part of the Campbell[s'] criminal activity. One of the ways that they tricked customers into doing business with them was by claiming that they had insurance when they, in fact, did not." (Sentencing Hr'g, R. 262 at 18.) Thus, the Campbells knew (or should have known) "that since they did not have insurance the customer would have to pay for whatever the Campbells' drivers damaged." (*Id.* at 19.) In other words, the Campbells' conspiracy made it more likely that their trucks would create insurance losses while on the road. With this finding, the district court properly considered these insurance losses as part of Melinda's loss amount.

14

This result tracks § 1B1.3 of the Sentencing Guidelines, which instructs us to consider all relevant conduct to determine the offense level. This consideration applies when we calculate the loss amount under § 2B1.1. *United States v. Bandy*, 172 F.3d 49 (6th Cir. 1999) (table). And this calculation includes "all reasonably foreseeable" conduct even if that conduct is not a federal crime (or charged as part of the conspiracy). *United States v. Kennedy*, 714 F.3d 951, 960–61 (6th Cir. 2013) (citing U.S.S.G. § 1B1.3(a)(1)(B)). Indeed, the district court explained this standard at the sentencing hearing. (*See* R. 262 at 18 ("When you look at the guidelines and the loss amount guideline, actual loss means that a reasonable, foreseeable pecuniary harm that resulted from the offense. And when you calculate that, you consider the full scale of the defendant's relevant conduct. I think it is pretty well-established that it is not just limited to the particular crime . . . [or] conduct solely presented at trial.").)

In sum, the district court made specific factual findings (including causation) about Melinda and her loss amount. The Campbells induced customers to contract with them by, among other things, claiming they had insurance. Yet they shipped goods in an uninsured truck, and when the goods became damaged, the customer became responsible for the damage. Melinda offers nothing to show that these findings were clearly erroneous. *See, e.g.*, *United States v. Turner*, 615 F. App'x 264, 268–69 (6th Cir. 2015).

We affirm the district court in all respects.